**SARKES TARZIAN, INC., a corporation, Plaintiff,**

v.

**AUDIO DEVICES, INC., a corporation, et al., Defendants.**

No. 1237-57.

United States District Court
S. D. California,
Central Division.

Sept. 8, 1958.

Findings and Judgment Oct. 23, 1958.

Dryden, Harrington, Horgan & Swartz, by Jacob Swartz, Los Angeles, Cal., Dutton & Kappes, by C. B. Dutton, Indianapolis, Ind., Mason Kolehmainen, Rathburn & Wyss, by M. Hudson Rathburn, Chicago, Ill., for plaintiff.

Birnbaum & Hemmerling, by Harold F. Birnbaum, Los Angeles, Cal., Pennie, Edmonds, Morton, Barrows & Taylor, by Thomas F. Reddy, Jr., Fritz L. Schweitzer, Jr., Merton S. Neill, New York City, Richards, Birnbaum, Watson & Smith, Los Angeles, Cal., for defendants.

YANKWICH, Chief Judge.

The Complaint in this case is denominated "Unfair Competition; Pira-

cy of Trade Secrets and Labor". In essence it seeks relief, to be more particularized hereinafter, for alleged violation by the defendants of alleged trade secrets consisting of methods of production of silicon rectifiers.[1]

# I

## The Issues As Framed By The Pleadings

The plaintiff, Sarkes Tarzian, Inc., to be referred to as Tarzian, is an Indiana corporation with its principal offices and facilities at Bloomington, Indiana. It is engaged in the operation of local radio and television stations and the manufacture and sale of components for electronic equipment, including silicon rectifiers.

The defendants include Audio Devices, Inc., to be referred to as Audio, a New York corporation, the second largest manufacturer of recording tape and accessories and recording discs in the United States with its principal office in New York City and manufacturing plants in Connecticut. Audio also engaged in the manufacture and sale of an electronic component known as a silicon rectifier at its office and plant in Santa Ana, California. Eight individual employees of Audio's Rectifier Division, formerly employed by Tarzian, are also named as defendants.

The Complaint filed November 1, 1957, alleges, in substance, that the plaintiff, as the result of a large expenditure of money, acquired by purchase and development confidential, restricted and secret data, production know-how and information which it utilized in its business of manufacturing and selling silicon rectifiers; that each of the individual defendants had knowledge of such trade secrets; that Audio "conspired" with the individual defendants by employing them, to deprive plaintiff of such trade secrets and to deprive plaintiff of the advantage which it had over its competitors.

In view of the discussion to follow it is well to note the names and positions occupied at Tarzian by its former employees who are named in the Complaint: George J. Eannarino was Director and Manager; Robert C. Parsons was Research Engineer; Frank Olesky was Production Supervisor; Hubert G. Dohmen was Technical Supervisor, Products Crystal Group; Charles C. L. Smith was Chief Quality Control Engineer; Clarence William Chesnut was Mechanical Technician; Frederick G. Schuller was Division Cost Accountant; Ernest C. Fries was Purchasing Agent.

The relief asked by the plaintiff is as follows:

1. That the defendants be enjoined from utilizing any of the information mentioned in paragraph VIII of the Complaint in connection with the manufacture, sale, development or other exploitation of selenium or silicon rectifiers;

2. That defendants be enjoined from disclosing to any person whomsoever any of the restricted, confidential and secret information mentioned in paragraph VIII of the Complaint;

3. For an accounting of all profits resulting from the manufacture, use or sale of silicon rectifiers;

4. For money damages in the amount of $1,000,000;

5. For $1,000,000 by way of punitive damages; and

6. Costs of suit.

The answer, filed December 11, 1957, denied that Audio in any way "conspired" to hire plaintiff's employees or to deprive plaintiff of its alleged trade secrets and alleges that silicon rectifiers, which are manufactured by more

---

1. A rectifier is a device which operates in an electrical circuit to convert alternating current to direct current. Rectifiers of various types, including tubes, have been employed for this purpose since the early days of radio. A miniature rectifier, utilizing the mineral silicon, was first announced by Bell Telephone Laboratories in 1952 and was a direct outgrowth of that company's development of the transistor.

than two dozen companies in the United States in a great variety of structures and characteristics for almost every known electrical application, are well-known devices in the art and the trade. The Answer asserts that the materials and methods, as well as the products, developed at Audio, by its personnel, including the individual defendants, are generally well known in the industry by plaintiff's competitors and are described in numerous publications and documents, including text books, periodicals, lectures, patents and government reports, all widely circulated in the trade and available to the public.

The Answer also contained a counterclaim for unfair competition. As it was discussed at the trial, its contents are omitted.

The facts proved will be discussed further on in the opinion.

One fact, however, may be adverted to now. Each of the former employees, except Frederick S. Schuller, at some time during the course of his employment signed an agreement relating to trade secrets. A typical one signed by Eannarino is reproduced in the margin.[2]

None of the employee-defendants had, at the time of their separation from Tarzian's employ, August 8, 1957, a term contract, all being employed from month to month.[*]

## II

### Trade Secrets And Unfair Competition

This is a diversity action.[3] Although for unfair competition, it is not

2. "For and in consideration of the original and continuing employment of the undersigned by Sarkes Tarzian, Inc. (hereinafter referred to as the 'corporation'), the undersigned hereby acknowledges and signifies his understanding and acceptance of the fact that all trade, engineering, production, and technical data, information, or know-how, including but not limited to customer lists, plans, specifications, drawings, sketches, lay-outs, and formulae, whether or not reduced to writing, used in the development and manufacture of Corporation's products, or in research conducted by it, are the exclusive secret and confidential property of Corporation and shall be at all times regarded, treated, and protected as such.

"Undersigned promises and agrees that he will at no time reveal, report, publish, disclose, or transfer to any person or corporation, or himself utilize other than in Corporation's business, any of Corporation's aforedescribed property without first obtaining Corporation's consent thereto, and it is understood that such consent can be given only by a duly authorized officer of Corporation.

"Undersigned further acknowledges that he understands that certain of the property referred to herein may have been obtained by Corporation from its licensors, and that unauthorized disclosure or use of such property may result in• punitive action by such licensors as well as by Corporation.

"Undersigned further hereby agrees to assign, and hereby does assign to Corporation, its successors, assigns, or nominees, all his rights to inventions or new developments relating to any subject matter with which his work for Corporation is or may be concerned, whether or not patentable, which undersigned has made or conceived or hereafter shall make or conceive during the period of his employment by Corporation, whether or not such inventions or new developments are made or conceived by undersigned personally or in conjunction with others, and whether or not made or conceived in the course of his employment or with the use of Corporation's time, materials, or facilities.

"Undersigned further agrees that he will, without charge to Corporation, but at its expense, execute, acknowledge and deliver all such further papers, including patent applications, as may be necessary to obtain letters patent for any patentable inventions in any country, and to vest title thereto in Corporation, its successors, assigns, or nominees. This agreement void unless the agreement signed by Sarkes Tarzian and George Eannarino on September 6, 1949, is upheld, and is terminated at the end of the contract."

* The defendant Eannarino had a contract for a five year period beginning September 6, 1949, which had expired long before his separation from Tarzian's employ. •

3. 28 U.S.C.A. § 1332.

pendent to a patent, copyright or trademark infringement.[4] There is a disagreement among the writers and courts as to whether a federal action for unfair competition has been created by the Lanham Act[5]. In view of the decision of the Supreme Court in Erie Railroad Co. v. Tompkins,[6] it is certain that the type of unfair competition for which recovery is sought in this action is, under the law of the Ninth Circuit, concededly governed by state law.[7]

■ In California, unfair competition is proscribed by statute.[8] Because the California statute refers disjunctively to *unfair* or *fraudulent* business practices,[9] the courts have held that it is not necessary to prove fraud.[10]

■ Unfair competition, under the law of California, may arise from unauthorized disclosure of secret practices.[11] This accords with the general law. The Restatement says:

"Unless otherwise agreed, after the termination of the agency, the agent;

"(a) has no duty not to compete with the principal; and

"(b) is subject to a duty to the principal not to use or disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent may use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent."[12]

The concomitant to this rule is given in another Restatement:

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

"(a) he discovered the secret by improper means, or

4. 28 U.S.C.A. § 1338(b).

5. 15 U.S.C.A. §§ 1121, 1125, 1126(b), (g), (h) and (i); Bucky v. Sebo, 2 Cir., 1953, 208 F.2d 304, 306–307; Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962; Pagliero v. Wallace China Co., 9 Cir., 1952, 198 F.2d 339, 341; Bunn, The National Law of Unfair Competition, 1949, 62 Harv.L.Rev. 987; and see, note, Trademarks, Unfair Competition, and the Courts; Some Unsettled Aspects of the Lanham Act, 1953, 66 Harv.L.Rev. 1094, 1101.

6. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

7. Pecheur Lozenge Candy Co. v. National Candy Co., Inc., 1942, 315 U.S. 666, 667, 62 S.Ct. 853, 86 L.Ed. 1103; Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 1951, 191 F.2d 141, 145; National Van Lines v. Dean, 9 Cir., 1956, 237 F.2d 688, 691; Hall v. Wright, 9 Cir., 1957, 240 F.2d 787, 795. The decisions from other circuits, while not consistent, accord generally with this view: See, Campbell's Soup Co. v. Armour & Co., 3 Cir., 1949, 175 F.2d 795; Dad's Root Beer Co. v. Doc's Beverages, 2 Cir., 1951, 193 F.2d 77, 80; Artype, Inc. v. Zappulla, 2 Cir., 1956, 228 F.2d 695, 697; Franke

v. Wiltschek, 2 Cir., 1953, 209 F.2d 493, 494; Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 1956, 234 F.2d 538, 540.

8. California Civil Code, § 3369.

9. California Civil Code, § 3369(3).

10. Wood v. Peffer, 1942, 55 Cal.App.2d 116, 123–124, 130 P.2d 220; McCord v. Plotnick, 1951, 108 Cal.App.2d 392, 395, 239 P.2d 32; Schwartz v. Slenderella Systems, 1954, 43 Cal.2d 107, 111, 271 P.2d 857; D. & W. Food Corp. v. Graham, 1955, 134 Cal.App.2d 668, 675–676, 286 P.2d 77; Applebaum v. Senior, 1957, 154 Cal.App.2d 371, 375, 316 P.2d 410; National Van Lines v. Dean, supra Note 7, 237 F.2d at page 691.

11. Hollywood Motion Picture Equipment Co. v. Furer, 1940, 16 Cal.2d 184, 188–189, 105 P.2d 299; Riess v. Sanford, 1941, 47 Cal.App.2d 244, 246–247, 117 P.2d 694; Aetna Bldg. Maintenance Co. v. West, 1952, 39 Cal.2d 198, 204, 246 P.2d 11.

12. Restatement, Agency, § 396. See, DuPont De Nemours Powder Co. v. Masland, 1917, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016.

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the fact that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

"(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."[13]

In the comment on this section two definitions are contained which are pertinent to the discussion to follow. The first is the definition of a trade secret:

"A trade secret may consist of any formula, patterns, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or list of customers."[14]

As to secrecy, the same comment states:

"The subject of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to others pledged to secrecy. Others may also know of it independently, as for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper · means, there would be difficulty in acquiring the information.[15]

California has for many years recognized the right of the employer to customer lists. This was established in the laundry route cases, the earliest of which dates to 1913 [16] and the latest of which were decided in 1957 and 1958.[17] But in enforcing the rule, California courts have insisted that the list be of a character which is secret,—that is names of customers who have been acquired, through solicitation, over a particular period of time. So that where it appeared that the buyers are persons, such as wholesalers, whose names are readily known to the trade through directories, trade catalogues or otherwise, an employer's list which duplicates them is not necessarily secret or confidential.[18] However, if the employee, through long association with them, learns of their buying habits, he will not be allowed to use such additional information to the disadvantage of the former employer.[19]

What is a trade secret is difficult to define. However, on the whole, it must consist of a particular form of

13. Restatement, Torts, § 757.

14. Restatement, Torts, § 757, Comment (b), pp. 5–6.

15. Restatement, Torts, § 757, Comment (b), pp. 6–7.

16. Empire Steam Laundry v. Lozier, 1913, 165 Cal. 95, 130 P. 1180, 44 L.R.A.,N.S., 1159.

17. Reid v. Mass. Co., Inc., 1957, 155 Cal. App.2d 293, 318 P.2d 54. See, Fortna v. Martin, 1958, 158 Cal.App.2d 634, 323 P.2d 146.

18. Avocado Sales Co. v. Wyse, 1932, 122 Cal.App. 627, 10 P.2d 485; Gloria Ice Cream & Milk Co. v. Cowan, 1935, 2 Cal.2d 460, 41 P.2d 340; Mathews Paint Co. v. Seaside Paint & Lacquer Co., 1957, 148 Cal.App.2d 168, 173–175, 306 P.2d 113.

19. George v. Burdusis, 1942, 21 Cal.2d 153, 159–160, 130 P.2d 399.

construction of a device, a formula, method or process that is of a character which does not occur to persons in the trade with knowledge of the state of the art or which cannot be evolved by those skilled in the art from the theoretical description of the process, or compilation or compendia of information or knowledge. Illustrative of such a situation is a leading California case wherein a person had been in the employ of an industrial corporation and its predecessor engaged in the manufacture of wood tanks, cooling towers and other industrial wood specialties for a period of 35 years. During a major portion of such period he was field superintendent, in which capacity he supervised the construction jobs of his employer and had access to their books, patents and engineering data. After terminating his employment, he began operating his own concern with his son, manufacturing tanks and cooling towers of the type manufactured by his former employers.[20] Although the court was of the view that there was evidence to show that

> "the business of constructing towers is extremely complicated and difficult and is dependent upon formulas developed by technically skilled engineers through long periods of trial and error,"[21]

and that the defendant

> "had a wealth of general experience which was the primary asset of the new concern,"[22]

nevertheless, the Court held that an injunction was properly denied, saying:

> "In the absence of uncontradicted evidence of respondents' having utilized appellants' confidential processes and trade secrets the demands

of appellants were properly rejected. To grant the relief prayed for by appellants would virtually operate to deprive respondents of their right to pursue a gainful and lawful occupation in the field for which they are equipped by virtue of Eskil Johnson's almost half century of service in his field. This, equity cannot do. *Every person is as free to pursue any calling he may choose as to possess any property he owns. He may compete fairly with his former employer for the patronage of former customers.* Continental Car-Na-Var v. Moseley, 25 Cal.2d 104, 110, 148 P.2d 9.

> "Injunction is not available to an employer to restrain a former employee *if the alleged secrets are not in truth secrets.* Scavengers Protective Association v. Serv-U-Garbage Co., 218 Cal. 568, 24 P.2d 489. It follows, therefore, from a review of all the evidence that, *whether the processes asserted by appellants to be their own or whether they were invented by respondent Eskil Johnson, respondents will not be disturbed in their use of them.*"[23] (Emphasis added.)

The Supreme Court of California, in a later case, made an identical ruling.[24] There, the court rejected the contention that, in soliciting a former employer's customers, the employee used the employer's cost methods, in estimating maintenance, saying:

> " 'Matters of public knowledge or *of general knowledge in an industry cannot be appropriated by one as his secret.*' Rest., Torts, § 757, com. b. No evidence was introduced which tended to prove that

20. Levine v. E. A. Johnson and Co., 1951, 107 Cal.App.2d 322, 237 P.2d 309.

21. Levine v. E. A. Johnson and Co., supra Note 20, 107 Cal.App.2d at page 327, 237 P.2d 312.

22. Levine v. E. A. Johnson and Co., supra Note 20, 107 Cal.App.2d at page 327, 237 P.2d 312.

23. Levine v. E. A. Johnson and Co., supra Note 20, 107 Cal.App.2d at pages 327–328, 237 P.2d at page 312.

24. Aetna Building Maintenance Co. v. West, supra Note 11, 39 Cal.2d at page 198, 246 P.2d 11.

Aetna used any unusual or secret material or equipment. On the contrary, the evidence shows that it regularly tested products of general use in the trade to determine which best suited its purposes.

"According to Aetna, its procedure for estimating the price of a new contract, was a trade secret. However, no evidence was introduced tending to prove that Aetna had developed a secret, or even improved, system of making estimates. The very most which is shown by the evidence is that Aetna utilized a highly efficient system designed to meet competition and avoid losses. Of necessity, any competitor in the business must consider all of the factors which entered into Aetna's computations. There is a total absence of any showing that the method of making estimates are secret, or that West was informed of any claim of secrecy. Under these conditions, West was privileged to use *'methods of doing business and processes which are but skillful variations of general processes known to the particular trade.'* Rest., Agency, § 396, com. b."[25] (Emphasis added.)

The writer expressed the same view in a case in which, although finding that the employee infringed the employer's invention, he was not guilty of unfair competition in soliciting orders for his device from certain airplane manufacturers, because the use of the particular product was confined to airplane manufacturers working in the particular field.[26]

## III

### Breach of Trust

■ In view of the extensive jurisprudence in California, there is no need to refer in detail to other cases, state or federal, which have been referred to and discussed in the briefs and arguments. Reference to some of them is given in a footnote, with indication to the law of the State under which they were decided.[27] Differences between state and federal decisions on to unfair competition relate, to a great extent, to degree. At all times, the aim of all courts in applying the concept has been to enforce

"increasingly higher standards of fairness or commercial morality in trade."[28]

25. Aetna Building Maintenance Co. v. West, supra Note 11, 39 Cal.2d at page 206, 246 P.2d at page 16.

26. Bourns v. Edcliff Instruments, D.C.Cal. 1954, 125 F.Supp. 503. See, Fortna v. Martin, supra Note 17, 158 Cal.App.2d at pages 637–640, 323 P.2d at pages 148–150.

27. Sandlin v. Johnson, 8 Cir., 1944, 141 F. 2d 660, 661–662, decided under the law of Missouri; Franke v. Wiltschek, supra Note 7, 209 F.2d at pages 494–495, decided under the law of New York; Colgate-Palmolive Co. v. Carter Products, 4 Cir., 1956, 230 F.2d 855, 864, which, although arising in Maryland, was seemingly decided on the basis of general law. Among some state cases which have applied the principle in the same manner are: Peabody v. Norfolk, 1868, 98 Mass. 452, decided under Massachusetts law; O. & W. Thum Co. v. Tloczynski, 1897, 114 Mich. 149, 72 N.W. 140, 143–144, 38 L.R.A. 200, decided under Michigan

law; Russell v. Wall Wire Products Co., 1956, 346 Mich. 581, 78 N.W.2d 149, decided under Michigan law; Roy v. Bolduc, 1943, 140 Me. 103, 34 A.2d 479, 149 A.L.R. 630, decided under Maine law; Heyden Chemical Corp. v. Burrell & Neidig, 1949, 2 N.J.Super. 467, 64 A.2d 465, 466–468, decided under New Jersey law; Westervelt v. National Paper & Supply Co., 1900, 154 Ind. 673, 57 N.E. 552, 554, decided under Indiana law; Donahue v. Permacel Tape Corp., 1955, 234 Ind. 398, 127 N.E.2d 235, 241, decided under Indiana law; Fort Wayne Cleaners & Dyers Ass'n v. Price, Ind.App., 1956, 137 N.E.2d 738, decided under Indiana law; Duane Jones Co. v. Burke 1954, 306 N.Y. 172, 117 N.E.2d 237, 245–246, decided under New York law.

28. Restatement, Torts, Introductory Note, Ch. 35, p. 540. And in applying the concept of unfair competition, the courts have condemned unfair dealing, although *they found no fraud.* This, because the

Commenting on this expressed aim, the Court of Appeals for the Third Circuit has stated:

"In any situation where the law is in the growing stage it is not to be expected that the advance in all courts will be simultaneous. Furthermore, when the final outcome on a given set of facts may vary, not with the legal concepts involved, *but their application* to particular states of fact, the pattern is inevitably less clear than in cases where a definite rule is to be applied."[29]

■■ California recognizes a right of action for inducing a breach of contract of employment by unlawful means.[30] Indiana does not seem to sanction such action.[31] More, regardless of any contract of employment, the tort of which the plaintiff complains,— the disclosure of their trade secrets,— occurred in California. For that reason also, California is the place of the wrong:

"The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."[32]

And, as already appears, under the law of the Ninth Circuit, the law of California will govern.[33]

This principle works into the general pattern of this branch of the law of unfair competition. And whether the courts consider the wrongful acquisition of trade secrets a violation of a property right or not, in the last analysis, the essence of it is a violation of trust. As stated by Mr. Justice Holmes:

absence of fraud "does not undermine the finding of unfair competition". Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L. Ed. 1386. This accords with California law. See references in Notes 8, 9 and 10.

29. Q–Tips, Inc. v. Johnson & Johnson, 3 Cir., 1952, 206 F.2d 144, 145.

30. Imperial Ice Co. v. Rossier, 1941, 18 Cal.2d 33, 35–36, 112 P.2d 631; California Auto Court Ass'n v. Cohn, 1950, 98 Cal.App.2d 145, 149, 219 P.2d 511.

31. See, International Shoe Co. v. Lacy, 1944, 114 Ind.App. 641, 646–647, 53 N.E. 2d 636, 638–639; Grimm v. Baumgart, 1951, 121 Ind.App. 626, 96 N.E.2d. 915, 917–918, 97 N.E.2d 871. Although this is an intermediate appellate court, its decision is binding on us, in the absence of decisions of the highest state court. See, Fidelity Union Trust Co. v. Field, 1940, 311 U.S. 169, 177–179, 61 S.Ct. 176, 85 L.Ed. 109; West v. American T. & T. Co., 311 U.S. 223, 236–239, 61 S.Ct. 179, 85 L.Ed. 139; Jones v. Schellenberger, 7 Cir., 1955, 225 F.2d 784, 791–792; John Hancock Mutual Life Ins. Co. v. Tarrence, 6 Cir., 1957, 244 F.2d 86, 87– 88; Johnson v. State Mutual Automobile Ins. Co., 8 Cir., 1958, 252 F.2d 158, 164; Liberty Mutual Ins. Co. v. Hartford Accident & Ind. Co., 7 Cir., 1958, 251 F.2d 761, 763. The more so, as a transfer to the Supreme Court of Indiana was denied. It is to be noted

that, ordinarily, under Indiana law, where an employment is not for a fixed term, it is terminable at will. See, Speeder Cycle Co. v. Teeter, 1897, 18 Ind.App. 474, 48 N.E. 595, 597; Montgomery Ward & Co. v. Quignet, 1942, 112 Ind.App. 661, 672, 45 N.E.2d 337, 341. It would seem also that an agency contract which, while binding the agent to the purchase of merchandise from the principal, and, while designating the agent as exclusive agent for the territory, does not designate the term, is unenforceable. Grimm v. Baumgart, supra.

32. Restatement, Conflict of Laws, § 377, And see, Jordan v. State Marine Corp. of Delaware, 1958, 257 F.2d 232, decided by the Court of Appeals for the Ninth Circuit in which, in applying this principle, the Court held that in an action by a citizen of Oregon who sued for loss of consortium because of injury suffered by her husband through the negligence of a steamship company while he was on a voyage from California to Japan, there could be no recovery under state law as the injury which resulted in loss of consortium occurred outside the State of California. The opinion states:
"*Here the last event to make the shipowner liable for the tort to the husband occurred on the ship while on the high seas.*" 257 F.2d 234. (Emphasis added.)

33. See cases cited in Note 7.

"Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good."[34]

Later cases have stressed this as the basic act which constitutes the tort. In a case already referred to the Court said:

"Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached."[35]

It is this breach of duty which the court protects, regardless of any specific contract undertaking the obligation of secrecy. But in applying the concept the law bears in mind the fact that prior employment of a person *does not* impose upon the employee, in the absence of a contract limited as to time and location, the duty not to compete with his former employer.[36]

The Supreme Court of California has stressed this point in a noted case.[37] In that case the plaintiff, an Indiana corporation, engaged in the business of manufacturing, producing, buying and selling compounds for finishing, cleaning and treatment of floors and of tools and appliances used for the purpose, and maintained an office in Los Angeles. From 1932 to March 31, 1941, the defendant Moseley was the District Manager under a written contract which he terminated on the latter date. The defendant, Franzus, a chemist, was employed in Indiana from September, 1934, to July, 1936, after which and until 1940 he was employed by Gerson-Stewart Corporation, an Ohio corporation.

Prior to March, 1941, Moseley, Franzus and a person from the Gerson-Stewart Corporation formed a corporation which acquired the Brobick Manufacturing Company, a concern doing business in Los Angeles. The corporation was formed in March, 1941, under the name of Gerson-Stewart Pacific Corporation and began its business on April

34. Du Pont De Nemours Powder Co. v. Masland, supra Note 12, 244 U.S. at page 102, 37 S.Ct. at page 576. See also, International News Service v. Associated Press, 1918, 248 U.S. 215, 236, 39 S. Ct. 68, 63 L.Ed. 211. The doctrine of *quasi* property promulgated by the Supreme Court in this case has not been applied by the lower courts to other fields of non-existing or expired property rights. See, Cheney Bros. v. Doris Silk Co., 2 Cir., 1929, 35 F.2d 279, 280; Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80; G. Ricordi & Co. v. Haendler, 2 Cir., 1952, 194 F.2d 914, 916. And see, Rudolf Callmann, Unjust Enrichment in Unfair Competition, 1942, 55 Harv.L.Rev. p. 595.

35. Franke v. Wiltschek, supra Note 7, 209 F.2d at page 495. And see, Head Ski Co. v. Kam Ski Co., D.C.Md.1958, 158 F. Supp. 919, 922–925.

36. Restatement, Agency, § 396; California Business and Professions Code, §§ 16601–16602. Indiana law also recognizes contracts by employes for limited restraints as to time and territory. See, Grand Union Tea Co. v. Walker, 1935, 208 Ind. 245, 195 N.E. 277, 98 A.L.R. 958.

37. Continental Car-Na-Var Corp. v. Moseley, 1944, 24 Cal.2d 104, 148 P.2d 9.

1, 1941, *the day following the termination of Moseley's contract with the plaintiff.*

On March 20, 1941, the defendants Moseley and Franzus mailed a form letter to a large number of the plaintiff's customers advising them that Moseley was leaving the plaintiffs' employ and would in the future be Sales Manager for the defendant corporation. Later Moseley and the new corporation solicited a large number of plaintiff's customers

> "to eighteen of whom they sold merchandise of the new corporation, the purposes of which products were the same as those of the products manufactured and sold by plaintiff in the territory."[38]

Plaintiff sought damages and injunction against the defendants' use of the customers list and alleged trade secrets. Judgment was in favor of the plaintiff for damages and injunction which enjoined the defendants from

> "using or divulging any trade secrets regarding the composition of the products manufactured or sold by plaintiff."[39]

The judgment was reversed. The higher court determined that the defendants had a right to engage in the same business as the plaintiff, saying:

"Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part of the contrary to follow any of the common occupations of life. Every individual possesses a form of property, the right to pursue any calling, business or profession he may choose. *A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted.*"[40] (Emphasis added.)

Of necessity, whenever a change of employment of this type occurs and former employees enter into the employ of another with whom they engage in a competitive business, it is inevitable that some of the knowledge acquired while in the employ of the other should be made available to the new employer. But, as already appears, the courts will not deprive the employee of the right to use the skill he developed through the years.[41]

38. Continental Car-Na-Var Corp. v. Moseley, supra Note 37, 24 Cal.2d at page 106, 148 P.2d at page 11.

39. Continental Car-Na-Var Corp. v. Moseley, supra Note 37, 24 Cal.2d at page 107, 148 P.2d at page 11.

40. Continental Car-Na-Var Corp. v. Moseley, supra Note 37, 24 Cal.2d at page 110, 148 P.2d at page 12. See, Alex Foods Inc. v. Woodson, 1955, 137 Cal.App.2d 415, 424, 426–429, 290 P.2d 646.

41. See cases referred to in Notes 21 and 24. As stated in Continental Car-Na-Var Corp. v. Moseley, supra Note 37, 24 Cal. 2d at page 108, 148 P.2d at page 11:
 "That defendant Franzus was entitled *to make use of his general knowledge of chemistry to manufacture floor wax and kindred commodities for the defendant corporation so long as he did not transgress upon the 'trade secrets' or secret formulae of plaintiff, may not be questioned.*" (Emphasis added.)
The fact, *stressed so much in the present case,* that negotiations for the association of employees with their prospective competitor were conducted while they were still in the old employ, was not deemed of any significance by the California court in the above case. Indeed, the new corporation formed in that case began business "the day following the termination of Moseley's contract with plaintiff" 24 Cal.2d at page 106, 148 P.2d at page 11. The Court declined to see evidence of "conspiracy" in that fact, although notice of the new association was sent to prospective customers prior to termination of employment. 24 Cal.

This view accords with a recent decision arising under Michigan law.[42] In that case the plaintiff, while acting as distributor for the defendant developed an industrial type of stacking basket made of wire which he later patented. The defendant devised and used a somewhat similar basket. The plaintiff claimed that he had disclosed the construction of the basket to the defendant under a pledge of secrecy. Although conceding that there was similarity between the two baskets, the Michigan Supreme Court refused to see a trade secret in the disclosure. On the contrary, they ruled that matters *readily ascertainable* could not be the subject of a trade secret, saying:

"It is clear that although 'for this limited protection it is not appropriate to require also the kind

of novelty and invention which is requisite of patentability' (Restatement, Torts, § 757), nevertheless, *the law does not protect knowledge so general as to be common property in the trade.* Ellis on Trade Secrets (§ 244) states the principle with accuracy in these terms:·

" '\* \* \* *where the idea was well known or readily ascertainable, the courts will rule that there is no legally recognizable trade secret. In other words, the discloser must treat the recipient of the disclosure equitably. That means that he cannot take advantage of the recipient's ignorance of facts well known or readily ascertainable.*' "[43] (Emphasis added.)

It is noteworthy that the Supreme Court of Indiana in a recent case [44] cites

2d at pages 112–113, 148 P.2d 9, 14. The Court quoted from one of its prior opinions a statement, a portion of which is here given as expressing the economic philosophy of California courts, which so readily protect real "trade secrets":
"For men to agree and plan to enter business as associates, even though they have a design to draw their patronage from any rivals, or all that a particular rival may have, does not constitute them conspirators. Practically every copartnership, corportion, or private individual which enters into business does so with the intent of drawing all the business it possibly can from all competitors. If it were not so, there would be no such word as 'competition' in business." Fidelity Appraisal Company v. Federal Appraisal Company, 1933, 217 Cal. 307, 308–309, 18 P.2d 950, 953.
See, Aetna Maintenance Co. v. West, supra, Note 11, 39 Cal.2d at page 203, 246 P.2d 11, for similar statement as to propriety of notice of intention to engage in competitive business. See also, Mathews Paint Co. v. Seaside Paint & Lacquer Co., 1957, 148 Cal.App.2d 168, 171, 306 P. 2d 113; American Alloy Steel Corp. v. Ross, 1957, 149 Cal.App.2d 215, 220, 308 P.2d 494.

42. Russell v. Wall Wire Products Co., 1956, 346 Mich. 581, 78 N.W.2d 149.

43. Russell v. Wallace Wire Products Co., supra Note 42, 78 N.W.2d at page 154.

44. Donahue v. Permacel Tape Corp., supra Note 27, 234 Ind. 398, 127 N.E.2d 241. In that case the Indiana Court invalidated a contract which prevented the employee from engaging, without the employer's permission, in similar business in the United States or Canada for a period of three years after leaving the employment. As to the employee's *right to use acquired skill* the court said:
"As an incident to his business the appellee (employer) was entitled to contract with regard to and thus to protect the good will of his business. Elements of this good will included 'secret or confidential information,' such as the names and addresses and requirements of customers and the advantage acquired through representative contact with the trade in the area of their application. These are property rights which the employer is entitled to protect. However, the same is not true regarding the skill and employee has acquired, or the general knowledge or information he has obtained which is not directly related to the good will or value of employer's business. *Knowledge, skill and information* (except trade secrets and confidential information) *become a part of the employee's personal equipment. They belong to him as an individual for the transaction of any business in which he may engage, just the same*

with approval the following statement from a Maine case:

> "'* * * (W)hile an employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers, he has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired * * or even instructions while in the employment. Public policy prohibits such undue restrictions upon an employee's liberty of action in his trade or calling * * *'"[45]

So there is agreement among the courts that, except, where *real* trade secrets are involved, an employee may compete with his former employer and use such knowledge and skill as he has developed in the former's employ. This accords with the main object of a free economy which is the basis of our industrial system. The Court of Appeals for the Ninth Circuit in dealing with the problems of unfair competition, even insofar as they relate to trademarks and tradenames, has stated:

> "*The law encourages competition not only in creativeness but in economy of manufacture and distribution as well.*"[46] (Emphasis added.)

## IV

### Epitome of Accepted Principles

The principle which places an employee under obligation, whether expressed in a contract or not, not to divulge any of the trade secrets of his employers is, as already appears from the preceding discussion, a part of the law of unfair competition. As such, whether there is a breach on the part of the employee or others, is a question of fact.[47] However, from the preceding discussion, certain principles emerge which may be considered accepted law, both under California law relating to the subject and the general law as applied in both state and federal cases. They may be stated briefly in the following manner:

Notwithstanding the duty of secrecy between the principal and agent,

1. An employee may, after retiring, compete with his former employer in the same business or even for the same custom;

2. There is no tort if, by legal means, one induces an employe to sever his employment with another;

3. The employee may announce to the trade his intended separation from the business of his employer and intention to enter into competition with him either by himself or with others;

as any part of the skill, knowledge, information or education that was received by him before entering the employment. Therefore, on terminating his employment he has a right to take them with him. These things cannot be taken from him, although he may forget them or abandon them." 127 N.E.2d at page 240. (Emphasis added.)

45. Roy v. Bolduc, supra Note 27, 34 A.2d at pages 480–481. The Maine court in the above case invalidated a contract with an employee not to engage in competitive business for five years, although it was limited as to territory within the state. The court used the language quoted and approved by the Indiana court which is cited in the text.

46. Pagliero v. Wallace China Co., supra Note 5, 198 F.2d at page 344. See Victor S. Netterville, California Law of Unfair Competition: Unprivileged Imitation, 1955, So.Cal.L.Rev. 240, 271–273.

47. 56 C.J.S. Master & Servant § 72. See, Pohl v. Anderson, 1936, 13 Cal.App.2d 241, 242, 56 P.2d 992. Where one claims invention for a process and seeks protection outside the patent laws "proof beyond a reasonable doubt is required". Friedman v. Washburn Co., 7 Cir., 1946, 155 F.2d 959, 962.

4. He may solicit his former employer's customers, if the list is of the type which is known to those engaged in the business and was not developed as a result of long cultivation and solicitation by the employer;

5. Trade secrets must be "the particular secrets of the employer as distinguished from the general secrets of the trade in which he is engaged".[48] For this reason, secrets acquired and developed as a result of long employment in the particular trade may be carried over and put to use by the new employer and for oneself;

6. Trade practices, to come within the obligation of secrecy must be secret. While they need not amount to invention, in the patent law sense, they must, at least, amount to discovery.[49] It follows that matters which are generally known in the trade or readily discernible by those in the trade cannot be made secret by being so labelled in an agreement.[50]

The reason is obvious. As stated in a case from the Fourth Circuit:

---

48. 56 C.J.S. Master & Servant § 72(b), p. 484.

49. As said in a noted case, A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 1934, 73 F.2d 531, 538–539, "A process may, however, be maintained in secrecy and be entitled to equitable protection even though invention is not present. The cases which deal with the elements necessarily present in a proprietary process are careful to *define such processes as resulting from invention, or discovery.* * * * Quite clearly discovery is something less than invention. Invention requires genius, imagination, inspiration, or whatever is the faculty that gives birth to the inventive concept. Discovery may be the result of industry, application, or be perhaps merely fortuitous. *The discoverer, however, is entitled to the same protection as the inventor.* In Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 639, 49 L.Ed. 1031, the plaintiff collected stock quotations, which it furnished its customers. Said Mr. Justice Holmes of its tabulation: 'It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's.' "The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons. Hundreds pass them by, till one more observant than the rest makes discovery. It is idle to say that, in the eyes of the law, interest may not in such case follow discernment." (Emphasis added.)

50. See Note; Protection of Use of Trade Secrets, 1951, 64 Harv.L.Rev. 976, 977–979. Because, as a part of the defendants' proof of knowledge in the trade of the principles claimed to be secret in this case, the Court allowed certain patent applications to be gone into, it should be stated that it is accepted doctrine that, while *the granting of the patent* may be considered an abandonment of any secrecy, there may, nevertheless, be secrecy in communicating the contents of the patent between the date of the application and the date of issue. See, A. O. Smith Corp. v. Petroleum Iron Works Co., supra Note 49, 73 F. 2d at page 536; Id., 6 Cir., 1935, 74 F.2d 934, 935; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1936, 80 F.2d 912, 922–923; Reynolds v. Whitin Mach. Works, 4 Cir., 1948, 167 F.2d 78, 86; Sandlin v. Johnson, supra Note 27, 141 F.2d at page 661. See *contra,* Speaker v. Shaler Co., 7 Cir., 1937, 87 F.2d 985, where the Court ruled that *the filing* of a patent *was a disclosure:* "The contents thereof were disclosed to the world by filing it in the patent office. Nothing therein could have remained confidential or secret." At page 987. (Emphasis added).

"The provisions of the contract which we have quoted cannot reasonably be interpreted as an agreement by defendants not to use machines or processes in use by persons other than plaintiff; for it would be absurd to designate as a confidential disclosure that which is publicly known. It is not sufficient, therefore, for plaintiff to introduce general testimony to the effect that Arthur had the idea of drying potatoes by the use of hot air and that defendants were given the benefit of his ideas while helping to build his machine. Plaintiff must show that he disclosed to defendants matters which were peculiar to the process and machine which he was developing and not common property, and that defendants used these in building their machine, and not merely devices and processes which were open to the public." [51]

This is but carrying into effect the principle declared many years ago by the Supreme Court of the United States that to constitute a trade secret *there must be discovery*.[52] And there is no discovery when one skilled in the art develops a process for effecting certain desired results.[53] In the case of an employee, the attitude of the courts is that expressed by a New York court that

"equity has no power to compel a man who changes employers to wipe clean the slate of his memory." [54]

## V

### Preliminary Factual Considerations

Before considering the main issue which is whether the defendants violated the trade secrets of the plaintiff by concert of action between Audio and the individual defendants who were former Tarzian employees, we advert to certain matters which can be disposed of with great brevity:

### 1. No Enticement.

As stated at the end of the trial, there is no evidence of enticement of the plaintiff's former employees by Audio. Audio is the second largest company engaged in the manufacture of recording tape and discs in the United States with its principal office in New York City and manufacturing plant in Connecticut.

The plaintiff, Sarkes Tarzian, prior to 1955, had engaged in the manufacture of selenium rectifiers. Desirous of engaging in the manufacture of silicon rectifiers, in 1955, it purchased the plant of the Silicon Corporation of America and removed it to Bloomington, Indiana, where it established its rectifier division. Some of the personnel, including George B. Finn, came along with the project.

Silicon, as already appears, is the second most common mineral in the world. Consequently, products which use it as a base have the advantage of an ample supply of the mineral in its original form.

By the middle of July 1957, the rectifier division of the plaintiff was producing a rectifier which could be sold, *in large quantities*, at 88¢. In the middle of July the defendant Eannarino, who at that time was Director-Manager of the division, entered into negotiations with Audio to interest them in the production of silicon rectifiers. After certain negotiations, Audio invested some $800,000 in new money which was secured through the sale of treasury stock in the purchase of a plant at Santa Ana, California, which they equipped with

51. American Potato Dryers, Inc., v. Peters, 4 Cir., 1950, 184 F.2d 165, 172.

52. Fowle v. Park, 1889, 131 U.S. 88, 97, 9 S.Ct. 658, 33 L.Ed. 67; Board of Trade of City of Chicago v. Christie Grain & Stock Co., 1905, 198 U.S. 236, 250, 25 S.Ct. 637, 49 L.Ed. 1031; Dr. Miles Medical Co. v. Park & Sons Co., 1911, 220 U.S. 373, 402, 31 S.Ct. 376, 55 L.

Ed. 502. See cases cited in Notes 18 to 26 and 41 to 46, inclusive.

53. See cases cited in Notes 21 through 27, inclusive.

54. Peerless Pattern Co. v. Pictorial Review Co., 147 App.Div. 715, 132 N.Y.S. 37, 39, quoted with approval in Avocado Sales Co. v. Wyse, 1932, 122 Cal.App. 627, 632, 10 P.2d 485.

machinery, materials and stock and trade, for the production of silicon rectifiers. The evidence shows that some $200,000 in additional money has been invested and that as of early December 1957 they were producing about 4,000 rectifiers a day. At or about the same time these were offered to the trade at 83¢. As of now, no profit has been realized by Audio.

Tarzian is a closely held family corporation, controlled by Mr. and Mrs. Tarzian. No employees, regardless of position, had any interest in its profits. And it was Eannarino's complaint that the provision in the five year contract which terminated in 1954, whereby he was to receive 5 per cent of the profits, was never fulfilled. He was unhappy about the situation and sought to interest others in the field, feeling that there were no patents or trade secrets involved.

▮▮▮ When Audio became interested he asked the other seven employees who are named defendants to join him in the new venture. Reference has beeen made to them as being "key personnel". I doubt if the appellation is correct considering the large number of persons employed by Tarzian and the complete control of the corporation by the Tarzian family. But even if it applies to the particular rectifier division, as the defendant-employees had no term contracts, they were just as much within their rights as Tarzian was, under both Indiana and California law, to terminate it by the shortest notice.[55]

Much is made of the fact that no disclosure of intention to leave was made and that Eannarino even accepted an advancement a few days before tendering his resignation. This is unimportant. In one of the leading California cases already referred to [56] the key employee continued his employment *until one day* before the new corporation with which he became associated began business. He even sent out written announcements of his future engagement before leaving his employ. The California court could see nothing extraordinary in this. Indeed, in our free, economy, social mobility is a chief characteristic. An employee who is dischargeable at will is under no obligation to treat his employer otherwise or with more consideration than he can be treated by him. It follows that, as Eannarino had a right to leave at will, his arrangement with the other employees and with Audio did not amount to a conspiracy on their part or on the part of Audio. The promised pay increase is not out of line with the type of increases which skilled employees seek when they change employment. The fact that Eannarino was given an option to purchase a certain amount of Audio stock, 25,000 shares, at a fraction less than market, $7.76 per share, is easily and reasonably explained by Audio: They felt that as he was to be in charge of a unit of production he had the type of responsibility which warranted encouraging him in acquiring stock in the corporation. Mr. William C. Speed thus described Eannarino's proposed work:

> "The crystal rectifier company out here in Santa Ana, although a division of Audio Devices, is run on an almost autonomous basis. George Eannarino is in charge of manufacturing, in charge of personnel, or at least he has people under him. In effect, he is—in effect and not in fact, he is the president of a small company out here in Santa Ana and then he has a plant manager of some kind under him and a production manager under him and I don't know what all.

> "So his job, though subordinate to my own, is very parallel or very similar to the plant manager in Stamford."

At any rate, as he was to pay for the stock, the value of which would increase only if the company and the unit he headed prospered, no ominous implica-

55. See cases cited in Note 30.

56. Continental Car-Na-Var Corp. v. Moseley, supra Note 37. See, Robert C. Hays, The California Law of Unfair Competition Takes a Turn—Against the Employer, 1953, 41 Cal.L.Rev. 38.

tion can be drawn from the option contract. So I find that the individual employees' separation from Tarzian was for legitimate business reasons and not the result of conspiracy betwen them, with or without Audio.

As already stated, this is not a case in which someone has reaped, in the language of Mr. Justice Pitney,

"the harvest of those who have sown." [57]

Audio has invested large sums of money in endeavoring to establish this new division. And while the plaintiff may still be entitled to recover for the detriment suffered, the situation before us is not that of a person who, without expenditure of money of its own, seeks a "free ride" through the unprivileged appropriation of value created by another.[58]

Audio is a manufacturer of high precision instruments. There has been no attempt to simulate the Tarzian product or to hold out their product as that of anyone but themselves. While the device they manufacture, because of its nature, must be of a certain size, it does not look like the Tarzian device. And the only indicia it carries are those common to the trade showing the type of radio or television device it can replace.

## 2. Audio's Equipment.

 Much was made at the argument of the fact that the equipment ordered for the new plant corresponded to equipment in use at Tarzian and was ordered from their suppliers. But the evidence is overwhelming that these *were not* machines built to specifications, but machines for pulling crystals, slicing crystals, dicing crystals and performing all the other steps necessary to the production of this device which are advertised in catalogues by nationally known firms who sell them either from stock or modify them to suit the particular needs of a manufacturer. They were not *a*

*secret source of supply* open only to Tarzian which he could bind his employees not to disclose to others. There is no evidence that any of the employee-defendants took with them any blueprints, written data or invoices. The evidence as to the disappearance of a so-called "security file" is nebulous. No one has traced it or its contents to any of the defendants. Indeed, there is no evidence as to its contents.

Stress is laid on the fact that before entering the business Tarzian purchased the Silicon Company of America (Silcoa) paying $160,000 for it. The establishment *was admittedly not a financial or manufacturing success,* and was promptly dismantled and moved from New York to Indiana. There are no details showing what the investment represented. It brought to Tarzian some key personnel as of January 1, 1956. But what knowledge they brought with them appears to have been acquired while in the employ of others, such as Sylvania. Tarzian may have deemed it to its interest to buy a complete "set-up" in order to go into the silicon rectifier business. This does not mean that others or even their own employees could not have duplicated it, without a purchase. Finn and his associates may have driven a good bargain, Tarzian a bad one. This does not mean that Eannarino and others, after they left their employ, could not carry on and use the knowledge they had acquired as to the sources of supply and the like which were known to the trade and not just to Tarzian. Nor can it be contended that because of this initial expenditure, these employees could not, in the future, assist another employer in duplicating the establishment and its equipment by paying for it, *not to Tarzian,* but to the manufacturers and suppliers who sold the machinery, materials and stock in trade to all comers.

These matters are grouped together because they are, in my opinion, the causes of the irritation responsible for

57. International News Service v. Associated Press, 1918, 248 U.S. 215, 239–240, 39 S.Ct. 68, 72, 63 L.Ed. 211.

58. See Note, Unfair Competition, 1933, 46 Harv.L.Rev. 1171, 1173.

the strong feeling existing in this case that manifested itself in the attempt of Tarzian to stop the defendants by injunction, even before the Audio rectifier division *was established* in California.

Granted that this may have been done, as stated by counsel, to "put them on notice", the question remains, especially in view of the frank statements of the employees to the press when they severed their relations with Tarzian, that they *did not* intend to carry to the new employers any trade secrets of Tarzian, Why not wait and see? The truth is that Tarzian was actually under the erroneous impression that he was entitled *to a monopoly in the low price field of rectifiers*. Unless his process of manufacture was a trade secret as defined in the preceding discussion,[59] he was no more entitled to keep out competition in that field than Henry Ford Sr. was entitled to prohibit Chevrolet and other manufacturers of automobiles in the low price field from entering it by paralleling his assembly line methods. There is ample evidence that at or about the time of the entry into the field by Audio, other manufacturers were offering silicon rectifiers in large quantities at or about the same price as Tarzian. As these were manufactured chiefly for use in their own radio and television sets, *they may not have been interested in outside custom*. That they are *now* cannot be traced to Audio's entry into the field. But even if it could be, it would not amount to unfair competition. A rival company has a right to choose its time to enter an open field and may draw from other employers persons who possess the skill acquired in the field.[60]

### 3. *The Problem of Damages.*

The testimony as to damages is nebulous. Granting that loss of profits through reduction of sales and price may be an element of damage, the plaintiff, in a case of this character, must show, as in an antitrust exclusion case, not only the reduced sales price but the gross profits which could have been realized after deducting the expenses for conducting the business.[61]

While the testimony of Tarzian which places $100,000 on the value of a license plus 5 per cent of the profits as the value is not contradicted, it may be disregarded if it does not carry conviction.[62] Certainly, the fact that Western Electric, with all its vast research facilities, offered a license under its own process for $25,000 is very significant. And while it was claimed that negotiations carried on for possible licensing were discontinued when this litigation began, contemporaneous letters exchanged between Tarzian and the would-be licensees indicate that the reason for the rejection was the onerous conditions which Tarzian sought to impose on licensee for what, as will ultimately appear, was not a secret process at all. Of course, even in the absence of proof of damages injunction may still issue provided that Tarzian had a trade secret[63] which was taken from them and used, even though so-far profitlessly, by the defendants. Our conclusion, to be

59. See parts II, III and IV of this opinion.

60. See cases cited in Notes 40 through 45, inclusive.

61. Eastman Kodak Co. v. Southern Photo Materials Co., 1927, 273 U.S. 359, 377–379, 47 S.Ct. 400, 71 L.Ed. 684.

62. It is the rule of the federal courts that oral, uncontradicted testimony may be disregarded if there are in it inconsistencies, or inherent improbabilities or undisputed facts contradict it. Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L.Ed. 501; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 1949, 173 F.2d 170, 174.

63. Straus v. Notaseme Hosiery Co., 1916, 240 U.S. 179, 181–183, 36 S.Ct. 288, 60 L.Ed. 590; Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 126–131, 67 S.Ct. 1136, 91 L.Ed. 1386. This accords with California law. See, Alex Foods, Inc. v. Metcalfe, 1955, 137 Cal. App.2d 415, 423–425, 290 P.2d 646; American Alloy Steel Corp. v. Ross, 1957, 149 Cal.App.2d 215, 218–220, 308 P.2d 494. Despite claims of great loss, on the financial statement furnished by Tarzian to Dunn and Bradstreet as of

amplified in what follows, is that Tarzian had no trade secret.

## VI

### No Trade Secrets Violated

In stating the grounds for the conclusion just announced, we shall not go into a detailed analysis of the voluminous record in the case.[64] We shall confine ourselves to stating the conclusion we reached as to the dissimilarity between the two processes. The court will respect the understanding that the detailed outline of the forty-three steps furnished under seal shall not be revealed. I believe that this can be done by outlining the essential steps which are necessary in the construction of a rectifier and involve no choice of alternatives. I should begin by saying that the art only dates to June 25, 1948, when Dr. William Shockley of the Bell Telephone Laboratory filed an application for what is known as a transistor which he described as

"Circuit element utilizing semi-conductive material."

The patent was issued on September 25, 1951.

A rectifier is a device used to change alternating current to direct current. It permits miniaturization of radio and television sets,—achieving the rectification required in an electrical circuit previously accomplished by larger devices, such as the selenium rectifier. The devices here involved are very small. They take the place of tubes or rectifiers made of more expensive material which previously accomplished this function.

Silicon, as already stated, is second most abundant element in the fourth group of the periodic system chart of the elements, established by Dmitri Ivanovich Mendelejeff in 1868. Silicates are the chief constituents of "any rocks, clays and soils".[65] Because of the abundance and cheapness of silicon, the use of its crystals for the making of rectifiers commends itself to the industry. Very revealingly, counsel for Tarzian in the opening statement disclaimed *any discovery* on the part of Tarzian to the rectifier as a device or to primacy in the use of silicon. His statement is reproduced in the margin.[66]

So the question comes down to just this: Has Tarzian developed a produc-

---

June 30, 1956, the "non-competitive agreements" are given a value of $5,000.00. This is reduced to zero in the statement of June 30, 1957. The acquisition of Silcoa seems not to have caused any change in the estimated value of "patents and trade secrets". For in the three years to which the financial statements referred, the values were given as follows: June 30, 1955, $681,756.00; June 30, 1956, $622,899.00; June 30, 1957, $565,043.00. So that, by Tarzian's own accounting methods, there was no change in their value through the accretion of any secret process of Silcoa's. More, the value of these patents and trade secrets was *depreciated* annually in the same manner, percentage wise.

64. The trial of this case consumed 17 days. The transcript in the case covers over 2,500 pages. Portions of depositions were introduced which were not transcribed into the record. The plaintiff introduced 214 exhibits, the defendants 274. Many of the exhibits consist of pamphlets and documents of many pages. All have been restudied since the trial

in arriving at the conclusions stated in this opinion.

65. Chambers' Technical Dictionary, Rev. ed., 1948, pp. 769–770.

66. "The plaintiff *doesn't claim,* your Honor, *that it has a trade secret of any proprietary rights of any kind in the rectifier as a device. And neither does it claim that it is the only one that uses the particular materials that are used to make a rectifier—the particular equipment or it is the only one that uses certain types of processes.* "What plaintiff's claim is that it is the only company that has assembled by patient trial and error—hunt, research and experiments, a process of manufacture which from beginning to end, from the handling of the materials when they come into the emergence of the completed device and integrated—putting a combination of all these things together in such a manner that it produces our particular type of rectifier so that it may be sold at a profit in the market for which it is designed."

tion process which is such a deviation from what was known and taught in the art that it has acquired a secret which its former employees were entitled to respect, contract or no contract, and Audio could not appropriate to itself? The answer to the question can be reached only if we analyze the steps which must be taken by anyone in order to manufacture a silicon rectifier. They are, in substance, as follows: (1) the acquisition of silicon crystals by purchase or the pulling of a crystal from silicon, (2) the test of the crystal, (3) the preparation of a crystal by slicing, (4) the etching of the crystal to insure uniformity, (5) the selection of certain material to use in the alloying process and the use of appropriate equipment for that purpose, (6) the mounting of the junction, (7) the treatment of the surface, and (8) the encapsulation. These processes are the same and must be followed without deviation by anyone who manufactures a silicon rectifier.

The experts of the defendant, Dr. Ben Alexander and Dr. J. Earl Thomas conceded that these were the essential elements. There is no need to refer in detail to their testimony. Some of it will be referred to further on in the discussion. The experts for the plaintiff, Mr. Arthur J. Warner and Dr. Virgil Bottom conceded this to be generally true although they tried to avoid the consequence of the admission by claiming that Tarzian did things in an unorthodox manner. Whether a method is or is not orthodox does not determine its validity as a secret. It is whether it is unique and unknown in the trade that is important, or whether there is discovery in selecting between alternative steps. For these reasons the answers of Dr. Bottom to the court's question constitute an important admission. They are reproduced in the margin.[67]

An analysis of the literature and especially of five exhibits [68] indicates that these steps and the alternative choice

67. His testimony was:
"The Court: May I ask you one question?
"These various processes which you have described for us are recognized methods in the art of achieving the things that we have in mind? For instance, the pulling of crystals is a recognized method of transmuting the multipolycrystalline to a uni-crystal by the method of what has been called etching. Etching is a method of cleaning metals and there are various methods of achieving that end either by polishing or running them through various compounds, the qualities of which are known to chemists and persons in the field.
"Every step in this process is a recognized process in the particular industry, is it not?
"The Witness: That is a very general question. I believe the answer to that would be yes, there are very few processes that are used which are not used in some other way. Certainly we etch lamp bulbs—lamp bulbs, for example are etched.
"Crystals of synthetic quartz are grown nowadays.
"The Court: And what you have outlined as you say is the uniqueness of the process as practiced, was that they used what you call unorthodox methods of arriving at certain results. Isn't that true?
"The Witness: Well, this is certainly true—some of the processes that are used—in fact, several of the processes which are used there are in direct conflict with the overwhelming preponderance of processes that are outlined in the literature.
"The Court: As applied to this particular art?
"The Witness: Yes, that is right."

68. 1. The Fused Silicon Rectifier by Herbert W. Henkels, published in the January 1957 issue of the Proceedings of American Institute of Electrical Engineers, p. 733.
2. Herbert W. Henkels, Germanium & Silicon Rectifiers, published in June 1958 issue of Proceedings of International Rectifier Engineers.
3. The Transitron Quarterly Progress Report published by U. S. Department of Commerce, Office of Technical Services, p. 1086, for period of July 1955 to October 1, 1955.
4. Industrial Preparedness Study on Power Transistors, 6th Quarterly Progress Report for period of April 1, to June 30, 1955.
5. Industrial Preparedness Study on Power Transistors, 8th Quarterly Prog-

of materials to use were generally known in the art late in 1957 and earlier. These reports teach not only the steps to be taken in the manufacture but also the methods to be applied and the choice of materials to be used in effecting th etching, alloying, soldering and encapsulation. It is very significant that in a general catalogue published by Du Pont in July 1957, and distributed generally to the trade, the various steps for constructing transistors and rectifiers are given. This, as a means of advertising the types of silicon they desired to sell. The introduction states:

"Hyperpure silicon in semiconductor and solar cell grades is produced in commercial quantities by the Pigments Department of E. I. du Pont de Nemours Co., Inc., Hyperpure

silicon is extremely pure; impurities are measured in parts per billion. It is manufactured expressly for use as a semiconductor in transistors, rectifiers, diodes, solar batteries and related devices * * * important products of the electronic industry.

"The need for Hyperpure Silicon arose when a group of scientists headed by Dr. William Shockley of Bell Telephone Laboratories announced the invention of the transistor in 1948." [69]

The manner of achieving junction in silicon is described in detail. The page is reproduced in the margin with numerical indication of the step in the process we have outlined above.[70]

ress Report for period of October 1, to December 31, 1955.

The specifications of Magnavox dated May 5, 1957 also contain full details of a silicon rectifier.

69. Du Pont Hyperpure Silicon Catalogue, introduction.

70. "(1) Hyperpure silicon is supplied by du Pont as polycrystalline material. For use in devices it must first be converted into monocrystalline form. (2) During the conversion, the raw material is doped to the desired type and resistivity range. Two methods of producing monocrystalline material are the *Czolcharlski technique* and the floating zone refining method of Keck and Golay. The illustrations show crystal growing furnaces and floating zone equipment.

"The monocrystalline material is then (3) *sliced and diced with diamond saws*, ultrasonic machine tools or similar cutting equipment. After *lapping*, (4) the *dice are etched* with special solutions, *provided with suitable electrical contacts and fabricated into devices*. (5) *A·P–N junction must be formed at a point in the formation of the monocrystalline material or as a step in the fabrication.* "*Papers published by scientists working in the laboratories of many electronic companies indicate there are a number of ways of building P–N junctions into silicon crystals.* The techniques were developed for use in making transistors, diodes, *power rectifiers*, solar batteries and related devices and are covered by patents issued

to the various electronic companies where they were invented. The Du Pont Company does not make any silicon devices, and thus is not in a position to supply any technical information about device fabrication.

"The following (6) is a brief description of published methods of creating P–N junction:

"The first P–N junctions in silicon were made by *fusing aluminum wires into N type silicon*. These small area junctions have been useful for a variety of low current devices. *Recently, a related technique has been used to prepare large area devices.*

"*Junctions can be grown into crystals by starting with a melt of silicon doped N-type, growing part of the crystal, then adding a surplus of P-type dope and growing more crystal.* Crystals with P–N or N–P–N junctions can be grown in this manner for transistors.

"A variation of this system is used to grow a series of junctions in one crystal. Crystals are grown from melts containing both P and N type doping agents with widely different segregation coefficients. *As the crystal is drawn from the melt, the rate of growth is varied by automatic programming.* The rate of growth of the crystal can make the segregation coefficients vary to a large enough extent to permit the formation of a series of P–N junctions down the length of the crystal. These rate grown crystals give higher yields of grown junctions.

All these reports antedate the separation of the employee-defendants from Tarzian. The last Henkels report is of a later date. But a study of the article shows that the literature he was giving was *the entire literature* which had grown up since the Shockley discovery. So what he was stating *was not something new* which he had discovered on the day of publication but *what the art taught*. And the dates of the numerous references confirm this clearly. As this is an equity case, it must be decided on the state of the record as it exists on the date of the decree, and the court may find the facts as they exist then without supplemental pleadings.[71] But even if we confine ourselves to dates preceding it is quite evident that Tarzian did not use anything that was a secret in the art at the time the employee-defendants left its employ.

Even assuming that, at the beginning, one of the processes, the surface treatment bath, as testified to by Frank Olesky, corresponded to the process used at

"Diffused junctions *are prepared by subjecting silicon wafers of one type to the vapor of an opposite type of doping agent at a high temperature. In this way P or N layers of controlled thickness are formed just below the conductor surface.* The method may be used for large area, high power devices or devices with more complicated geometrics where exceedingly small dimensions are required. At present this technique is used to produce solar batteries and is being developed for a variety of rectifiers and transistors.

"(7) Junctions of controlled dimensions can be made by projecting streams of water containing the salt of a desired doping agent against wafers of silicon.

"First the silicon wafer is made an anode and the jet of salt water the cathode. Thus electrolysis eats away the silicon to some desired thickness. The polarity of the stream is then reversed and the doping agent plates out of the freshly etched surface. These 'surface barrier' junctions show promise for high frequency transistors since the geometry of the devices can be controlled to very narrow limits." (Du Pont Hyperpure Silicon Catalogue, 7–57, p. 8). [Emphasis added]

71. Federal Rules of Civil Procedure, Rule 15(b), (c) and (d), 28 U.S.C.A. In a handbook issued by Tarzian in 1956 and revised in June 1957, called "Silicon Rectifier Handbook," the "manufacturing process" is described as follows:

"Silicon does not readily lend itself to zone refining, therefore, the most popular method to produce single crystals of pure silicon is crystal 'pulling' where a seed of pure single crystal silicon is dipped into molten silicon, rotated slowly and withdrawn at a predetermined rate. A major problem in crystal 'pulling' is to keep the resultant crystal free from contaminants. Molten silicon is very active and attacks the materials used in containers and holders. Quartz crucibles are commonly used and the entire process is conducted in an inert atmosphere to reduce the possibility of contamination. Temperature is also very important and plus or minus 0.1° C at approximately 1430° C must be maintained.

"When it is determined that the crystal has resulted in the desired type, (either 'P' or 'N') and that the resistivity is within the range that will produce suitable voltage ratings, the crystal is cut into thin slices, and finally into small wafers or dice of desired size and thickness.

"After suitable etching and grading to separate wafers that do not conform to established thickness specifications, the dice are alloyed by a special process. Alloying is conducted at high temperatures and provides not only a 'P'–'N' junction on one side of the wafer but a low ohmic contact on the base. Low resistance contacts are important, since once the internal space charge is overcome the resistance of the cell decreases exponentially and contact and lead resistances become factors limiting current flow.

"Alloyed dice are brazed to a base and then sealed after a contact is provided to the alloyed side. Extreme care must be taken during the mounting and assembly operations to keep the surface free from contamination of any type since contaminants will ionize and shunt the junction.

"Final electrical and mechanical tests are performed before and after successive heat cycles to make certain that the rectifier is stable under all conditions of temperature, humidity, altitude and shock."

It is difficult to understand how Tarzian can claim as trade secrets against the defendants that which it, *in substance*, voluntarily discloses to whomever was willing to pay $1 for the handbook.

Tarzian, it has now been abandoned. And even if its use were still going on, we could not, under the doctrines of *de minimis* and *injuria absque damno,* try to evaluate and base equitable relief on it. More, as indicated, it was not a secret.

 In brief, one who claims a trade secret cannot fix a rigid date. If a process rises to the dignity of a valid trade secret more than a difference of a month or so is necessary to turn it from a trade secret into a matter of general knowledge within the trade. This is especially true when there is no patent involved. For a patent may, from the moment of its issuance, make what had been a secret process a patentable process dating back to the date of the application.[72]

## VII

### The Audio Process Today

The Audio processes used today show the following deviations from the Tarzian methods:

*1. Crystals:*

Audio originally obtained crystals from Du Pont already oriented. From these they grew their first crystals, on plane 1–1–1 (111). They now purchase some crystals from Knapic Electrophysics. The crystals they now pull are formed from N-type (or Grade 2) silicon. These crystals cost less "than for Audio to pull them".

Audio does not use any Latini equipment. Their seed holder is completely different. So are their water cooling system and flanges. Parsons stated:

"The differences between Sarkes Tarzian pullers and these are fairly numerous.

"The drive, a rotation mechanism, is completely different. The screw and half nut device to lower the seed into the melt on the Audio Devices' pullers are completely different.

"The design of the water cooling flanges we feel are different.

"Q. Well, is there an internal system for water cooling?

"A. Yes, These flanges are water-cooled internally. I believe Sarkes Tarzian, the flanges at Sarkes were much more bulky, had external and internal cooling.

"The arrangement of the seal is different. The platform which the lower flange is resting on is completely unlike that of Sarkes Tarzian. It is supported on two pillars or posts as compared to a rack drive at Sarkes Tarzian.

"I think those are some of the major differences."

Audio does not use Solar Grade silicon. Nor do they dope silicon. Tarzian doped with "solar cell material" which contains

"roughly 1,000 times the N-type donors that the high grade material contains".

Their speed of rotation is 1 to 3½ RPM, Tarzian's is ¾ RPM. Audio's maximum speed of withdrawal is 3½ inches per hour, Tarzian's is 6 inches per hour. And Audio uses a 25 kilowatt induction heater, a standard Westinghouse R.F. generator, while Tarzian uses 10 kilowatt and 15 kilowatt heaters, in connection with the crystal-puller.

*2. Cutting Dice:*

Audio's first cut is longitudinal to form a slab rather than a wafer. The slabs are cut of about 115 to 118/1000th in widths. As a result, the major surface of each die is in the 111 plane. No plastic or resin is applied between the first and second Audio cuts.

Audio removes all the wax with hot sulfuric acid. Tarzian uses Fotocol or alcohol first. Audio's sulfuric acid cleaning is followed by washing in acetone.

*3. The First Etching:*

Audio etches to size with 3–8–0 hydrofluoric acid-nitric acid mixture. Tarzian

---

**72.** See cases cited in Note 50.

uses 1–5–0. Audio's etching time is variable and is determined by previous measurement of dice size. They do not use a transfer tray from here through the remainder of their process. Tarzian's process is based on the use of a transfer tray.

The importance of the change was thus stated by Petrosky:

"Q. Is this transfer jig thereafter used in the process up to and including the step of encapsulation? A. Yes, it is.

"Q. So that the units remain in the transfer jig for the remainder of the process up to and including the encapsulation? A. The transfer tray is used as a means of material handling and the units stay in there until certain operations are done throughout the process.

"Q. Up to and including the final encapsulation and sealing operation? A. That is correct."

This is a "mass-production" and "labor saving" technique.

*4. Checking:*

Audio's dice thickness is controlled to 8/1000ths of an inch plus or minus 1/1000th. This is 11 per cent thinner than Tarzian's which is 9/1000ths plus or minus 1/1000th. Audio makes acceptable quality limits check: the dice found to be less than 7/1000ths are not used.

*5. Alloying:*

(1) Audio's composition for alloying in graphite alloying boats or jigs is different:

(a) One per cent gallium, plus or minus ½ per cent, the balance aluminum. Tarzian's is 3 per cent gallium, 97 per cent aluminum.

(b) Audio's volume of tin to A1–G is 4:1, Tarzian's 5:1. There is no conical recess at the bottom of Audio's jig holes. Tarzian has conical or "relieved" hole at bottom, which is tapered.

(2) *Temperature*—Audio's alloying temperature is 905° C., Tarzian's 960–970° C.

(3) *Vacuum*—Audio attains a vacuum down to or less than .001 microns, Tarzian .01 microns.

(4) *Equipment*—Audio uses a 6 inch bore on the diffusing pump. Tarzian a four inch. The larger bore aids "the pump down time considerably."

(5) *Oven Speed*—Audio's equals 0.46 inch per minute which equals 27 inches per hour, Tarzian's equals 36 to 38 inches per hour.

The following colloquy between the Court and Petrosky throws light on the choice involved in the use of devices for alloying:

"The Court: Isn't it true with regard to all of these precision tools, while there may be a standard nevertheless you ask the manufacturer to adjust it to your own particular operation. That being true the manufacturer takes what is a standard tool and adjusts it to your particular needs so it would fit your particular operation. Is not that true?

"The Witness: Yes.

"The Court: In other words, there are pullers, and there are all sorts of things. I see invoices for all sorts of tools, which are ordered at some indicated sizes, and the like. Isn't that true?

"The Witness: Yes, your Honor. In the case of the alloying furnaces, we had this man come out, and we told him just exactly what we wanted, and he told us what he could do, and then he went away and designed these things and sold them to us.

"In the case of the slicing and dicing equipment, basically the people that supplied us with the slicing and dicing equipment built the machine around a very high class surface grinder. However, they had to confer with us, and we spent a lot of engineering time, and so on, so they redesigned it to do this particular operation, and they developed it in that way.

"The Court: That is right.

"The Witness: Actually in the case of the slicing and dicing machines, I believe we bought six of them, and I think we paid in the neighborhood of $7,000 or $7,200 apiece for them.

"The Court: Apiece?

"The Witness:—where originally a piece of that equipment would have sold for perhaps $4,500.

"The Court: $4,500. It is the same when you deal with all precision items. Like if you are in a laboratory, and you want a special type of microscope, the company that sells microscopes may sell them for general use, and if you want a special one for high precision work, they will make one specially for you; isn't that true?

"The Witness: That is true.

"The Court: But in its essence it conforms to what the standard thing would be, except it is reduced so as to fit your operation.

"The Witness: Yes, it is modified.

"The Court: Modified. I am sorry. You got the better word. It is modified."

*6. Soldering:*

(1) Audio's etching jig is different from Tarzian's. For this reason, no transfer tray can be used.

(2) *Flux*—Audio uses a much larger amount of flux, one drop per unit, applying it individually with a hypodermic needle to "get it in the center". Tarzian uses it very sparingly and applies it by spraying it onto the welding fixture with an atomizer, at 3 or 4 feet.

(3) *Base*—Audio's outer plate is of silver, Tarzian's of nickel.

(4) *Jig*—Audio's jig is made of aluminum, Tarzian's of graphite.

*7. The Second Etching and the Associated Rinsing Procedure:*

(1) Audio's schedule is different in 6 of the 7 steps of the second etching, having in common only the use of a NaOH and $HNO_3$.

(2) *Surface Treatment*—Audio uses acidified sodium citrate solution $P^H6-4$, Tarzian uses alkaline sodium carbonate solution $P^H10-12$.

(3) *Silicon Varnish*—Audio applies it with a hypodermic needle, so as to "put a head of varnish on the junction". Tarzian dabs a whole tray with a pad.

*8. Encapsulation:*

The Audio encapsulation is a welded seal by which "the rectifier cap or hat is put on". Tarzian encases in a threaded ceramic body. No silicon grease is used by Audio. Tarzian fills with silicon grease the open end of the insulating bodies to cover the junction before final encapsulation.

*9. Total Production Time:*

Audio's total production time is 40 hours, Tarzian's about 20 hours.

## VIII

### Confirmation of Audio Process From Other Sources

What precedes is a correct summary of the testimony given by witnesses Olesky and Parsons and the deposition of Petrosky, who were in charge of the process. And in grouping the facts we have followed, with modifications, the framework of the outline inserted into the record by counsel for the defendants as a part of their closing argument. They have been checked as to detail against the record and modified and amplified as required. They are confirmed by the testimony of Dr. J. Earl Thomas. What may be called the *major* differences were stated by him in this manner:

"To my mind they are similar in one respect in which there is a choice, and in that they are similar to a number of other processes and they are different from a number of others, and that is in the use of a tin-aluminum alloy.

"Now, they are very, very different in three major respects. One of them is the orientation of the silicon wafer.

"The Court: To the 1-1-1 plane?

"The Witness: One of them is the use of a tantalum wafer to provide an electrode contact. And instead of a spring contact that provides a much better contact in the Audio rectifier and enables the Audio rectifier to carry a higher surge current than the Sarkes Tarzian rectifier. And the last is the use of a true hermetical seal on the Audio rectifier as opposed to the screwed-together ceramic capsule of the Sarkes Tarzian rectifier.

"I think those are the major differences—the use of a 1-1-1 plane in the Audio rectifier should have a very strong effect on the yield in the process.

"The Court: So that in your view they should, using the language of patent law, they result in a better result?

"The Witness: The Audio rectifier should be better than the Sarkes Tarzian rectifier in my opinion.

"The Court: And perform the same function, however?

"The Witness: Perform the same function but perform it in a superior fashion.

"The Court: All right.

"Q. By Mr. Reddy: Dr. Thomas, in respect to those steps in the process which must necessarily or logically should be done by a manufacturer, making a silicon rectifier, an alloy junction rectifier of this type, what steps do you feel do exist that are similar as to which there are no real alternatives? A. The growth of the crystal, of course, is the first one.

"The resistivity and conductivity type checks. The second, the fact of cutting dices. The third, of course, the particular orientation—there is a choice.

"The assembly of the rectifier in some kind of a jig to hold it during alloying.

"As I have stated there is no choice. One may have a choice as to the type of jig but one must assemble in some kinds of jig. One must alloy in some kind of furnace.

"One must solder the rectifier to the base. There is no choice.

"Up until very recently there was no choice in the matter of etching. In the last few months I have heard that it is now possible with extreme laboratory type conditions to avoid that step.

"I doubt that it will be possible in production but time will tell. Testing the characteristics of the rectifier, there is essentially no choice. One might very studiously avoid using an oscilloscope for making the check but he would simply be hamstringing himself by making the test too difficult.

"The required step of encapsulation. There is no choice but of course the method of encapsulation is different.

"Q. Is the method of encapsulation at Sarkes Tarzian and Audio Devices different? A. Quite different.

"Q. Quite different in your opinion? A. As different as two methods could be."

Further on in his testimony Dr. Thomas referred to certain *minor* differences:

"Q. Yesterday you testified to some major differences that you observed in the Sarkes Tarzian device—Sarkes Tarzian process and Audio process.

"In the course of your observations of the Audio process at the plant are there other differences of some significance you have observed. A. Yes, the design of their hood, for example, is completely different. The design of their etching equipment is completely different. The doping of the crystals that they use as their starting material is completely different. We haven't mentioned that.

"Of course, it has been testified to, but the method of application of varnish to the finished rectifier is completely different.

"The method of application of flux to the rectifier is completely different.

"The method of soldering the dice to the base of the rectifier is completely different.

"The method of removing the wax from the dice is different.

"The alloy composition ratio is different.

"The etching times are different.

"The drying and rinsing procedures are completely different.

"Q. Is the soldering operation— does that operation take place in an oven of any kind and particularly in an oven with a moving belt? A. It does not.

"Q. Is there any such device as a transfer tray utilized at Audio Devices, Inc.? A. There is not. I think there are other differences. I just can't pluck them out of the air at the moment."

There is corroboration of this in the testimony of the other expert, Dr. Ben Alexander. As was to be expected, the plaintiff's experts do not agree. They see uniqueness in the Tarzian process and similarity with the Audio process. There is no need to set forth their views. Suffice it to say that the court accepts as correct the comparison of the two processes and the statement of dissimilarities, as they appear from the testimony and exhibits referred to above. They are also reenforced by an examination of the patents in which the various steps claimed as secrets for the Tarzian process are taught.

### Summary and Conclusion

In a noted opinion Chief Judge Cardozo has stated:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate."[73]

So the law frowns upon breaches of trust by those, including employees occupying fiduciary relations.[74] California provides that everything which an employee acquires by virtue of his employment, except his compensation, belongs to the employer.[75]

This, of course, means that an employee, on the employer's time, cannot engage in other work or receive compensation therefor in fraud of the employer.[76] This has never been interpreted to prevent the employee from using the knowledge he has acquired while in one man's employ after he leaves that employ. The law does not require the employee to make a *tabula rasa* of his mind, by erasing from it the knowledge he has acquired. This is what is attempted here: Employees who had conducted a special department entered into the employ of another in an open field. The former employer had no patent on the art nor had he discovered any process which was not known or readily discernible by

73. Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1.

74. Hollywood Motion Picture Equipment Co. v. Furer, 1940, 16 Cal.2d 184, 188–189, 105 P.2d 299; Stone v. Goss, 1903, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344; Guth v. Loft, 1939, 23 Del.Ch. 255, 5 A.2d 503; Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 1953, 207 F.2d 912.

75. California Labor Code, § 2860.

76. See writer's opinion in B. F. Goodrich v. Naples, D.C.1954, 121 F.Supp. 345, 348 et seq.

others in the field. Tarzian was entitled to claim *his own trade secrets* but not

> "the general secrets of the trade in which he is engaged."[77]

At best, a trade secret protects only during the period when others working in the some field do not, in the ordinary course of their work, make the same discovery. Even in pure science where the problem situation is much more diffuse than in industrial research or development, there are many well authenticated cases of simultaneous discovery by persons or groups who and whose works were completely unknown to one another. A classic example is the discovery of pasteurization by three different persons within the same year. When it comes to a trade secret in manufacturing there is greater likelihood of simultaneous discovery: There is a common market to be served by several principals, the desire to compete in the market, and the common problem involved in producing for the specific market, as, for instance, a low price market, and the urgency to meet the problem. Consequently, all who are engaged in the field work not only within what a distinguished anthropologist has called "the configurations"[78] of the same culture but within the limits of a specific problem. This, as in the economic field, may result in parallelisms of action which may be fortuitous because they are inherent in the problem and in its solution, and not the result of conscious copying or imitation.[79]

As amply appears from the foregoing discussion, some of the steps involved in the production of silicon rectifiers are common to any method of production simply because everyone producing a rectifier, large or small, expensive or inexpensive, must go through these processes. And there is no selectivity between alternative steps. So the differences between the two processes under discussion here appear as the conscious attempt by former employees not to infringe upon whatever element of selectivity between alternate procedures there may have been in the Tarzian process.[80]

77. See cases cited in Note 48.

78. Alfred L. Kroeber, Configurations of Culture Growth, 1944.

79. United States v. Twentieth Century-Fox Film Corp., D.C.S.D.Cal.1955, 137 F.Supp. 78, 93, and authorities cited in Notes 22 and 23 of the opinion.

80. Because of the technical nature of the device involved there is attached a group of definitions offered by the plaintiff in the case which gives the meanings of the words as used in the field:
*Semiconductor*—A material having an electrical conductivity intermediate between that of an insulator and a metal. The electrical characteristics of a semiconductor material are strongly dependent upon the presence of very small quantities of certain impurities. Semiconductors may be compounds or elements. Examples of the former are copper oxide and indium-antimonide. Silicon and germanium are examples of elemental semiconductors.
*n-Type Semiconductor*—A semiconductor material in which electricity is conducted by means of negative charges, or electrons. The addition of small quantities of such impurities as phosphorous, antimony or arsenic to pure silicon causes it to become n-type.
*p-Type Semiconductor*—A semiconductor material in which electricity is conducted by positive charges (called holes). The addition of small quantities of such impurities as aluminum, gallium and indium to pure silicon causes it to become p-type.
*Intrinsic Semiconductor*—A semiconductor material in which the impurity concentration is negligibly small.
*p-n Junction*—The boundary between two regions of a semiconductor, one region being p-type and the other n-type.
*Rectifier*—A device which permits an electrical current to flow more readily in one direction than in the opposite direction.
*Silicon Rectifier*—A rectifier consisting of a p-n junction in silicon together with its electrical connections and housing (if any).
*Peak Inverse Voltage*—The maximum voltage which may be applied to a silicon rectifier in the reverse direction.
*Transistor*—A semiconductor device used to amplify electrical signals.

 On the whole, I find no violation of trust by the employee-defendants in seeking employment with Audio or urging them to engage in a business competitive to that of Tarzian. I find that the method employed by Audio is distinct from and was not and is not now, in substance, the secret process of Tarzian.

Judgment will be for the defendants, that plaintiff take nothing by the Complaint. Costs to the defendants. Formal findings and judgment to be prepared by counsel for the defendants under Local Rule 7, West's Ann.Code.

## APPENDIX A

(EDITOR'S NOTE: Because of the significance of this decision, the Findings and Judgment dated October 23, 1958 filed in the case are attached with convenient references to the transcript and exhibits as well as the original opinion of the court to which each finding relates.)

*Electrical Current*—The rate at which electrons move past a point in a conductor. A current of one ampere is about 6 billion billion electrons per second.

*Silicon*—An element in the fourth group of the periodic table. The atomic weight of silicon is 28.06 and its atomic number is 14.

*Single Crystal*—A solid in which all the atoms are arrayed in order. For example, the atoms in single crystal silicon are arranged in a 3 dimensional cubic array.

*Miller Indices*—A set of numbers used to define a particular set of atomic planes in a crystalline material. For example, the 111 planes in silicon pass through alternate corners of the unit cube.

*Rated Voltage*—The maximum direct current voltage at which a silicon rectifier may be operated as specified by the manufacturer.

*Forward Direction*—The direction in which a p-n junction has the larger conductance.

*Reverse Direction*—The direction in which a p-n junction has the smaller conductance.

*Forward Current*—The current which flows through a rectifier when a voltage is applied in the forward direction.

## Findings of Fact and Conclusions of Law and Judgment

The above-entitled cause came on regularly for trial by the Court without a jury; and the Court having duly considered the evidence and being fully advised in the premises, hereby makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52, Federal Rules of Civil Procedure, 28 U.S. C.A.

### Findings of Fact

1. Plaintiff, Sarkes Tarzian, Inc. (hereinafter referred to as Tarzian) is an Indiana corporation with its principal place of business located at Bloomington, Indiana, and is, and has been for some time engaged in the manufacture and sale of electronic component parts, includig silicon rectifiers.[1] (Complaint, pars. I, VII).

2. Defendant, Audio Devices, Inc. (hereinafter referred to as Audio) is a

*Reverse (or leakage) Current*—The current which flows when a voltage is applied in the reverse direction.

*Ohmic Contact*—An electrical contact to a semiconductor having substantially the same conductance for both directions of current flow. A nonrectifying contact.

*Slice (or Wafer)*—A portion of a silicon crystal cut at right angles to the axis of the crystal and having a large diameter to thickness ratio.

*Die (plural Dice)*—A small piece of silicon crystal usually prepared by cutting the wafer into bits.

*Etching*—A chemical process for the removal of undesired material.

*Alloy Junction*—A p-n junction formed by the alloying process. Sometimes called a fused junction.

*Alloying*—The process whereby a p-n junction is formed by dissolving a portion of a semiconductor crystal in a molten metal, allowing the dissolved material to regrow upon the original crystal and simultaneously adding the requisite impurity.

*Hole*—A positive charge in a semiconductor material. Electrical current in a p-type semiconductor is conducted principally by holes.

1. A rectifier is a device which operates in an electrical circuit to convert alternating current to direct current. Rec-

New York corporation with its principal place of business located at New York City, New York and is, and has been engaged for many years in the business of manufacturing and producing recording discs, magnetic recording tape and accessories for electronic sound recorders. Audio is also engaged in the manufacture and sale of an electronic component known as a silicon rectifier at its office and plant at Santa Ana, California. (Answer, pars. 9, 11, 20).

3. Defendants, George J. Eannarino, Robert C. Parsons, Frank Oleksy, Hubert G. Dohmen, Charles C. L. Smith, Clarence W. Chesnut, Ernest C. Fries and Frederick G. Schuller (hereinafter referred to as the individual defendants), formerly employees of Sarkes, Tarzian, Inc., were, at the time of the commencement of this action, employees of Audio and citizens of the State of California. (Complaint, pars. V, IX; Answer, pars. 4, 5).

4. The matter in controversy exceeds in value the sum of Three Thousand Dollars ($3,000), exclusive of interest and costs. (Complaint, par. VI).

5. The Complaint, filed November 1, 1957, alleged, in substance, that the plaintiff, as the result of a large expenditure of money, acquired by purchase and development confidential, restricted and secret data, production know-how and information which it utilized in its business of manufacturing and selling silicon rectifiers; that each of the individual defendants had knowledge of such trade secrets; that Audio "conspired" with the individual defendants by employing them, to deprive plaintiff of such trade secrets and to deprive plaintiff of the advantage which it had over its competitors. (Opinion, ante, p. 254).

6. The Answer, filed December 11, 1957, denied that Audio in any way "conspired" to hire plaintiff's employees or to deprive plaintiff of its alleged trade secrets, alleged that silicon rectifiers,

which are manufactured by more than two dozen companies in the United States in a great variety of structures and characteristics for almost every known electrical application, are well-known devices in the art and the trade and asserted that the materials and methods, as well as the products, developed at Audio, by its personnel, including the individual defendants, are generally well known in the industry by plaintiff's competitors and are described in numerous publications and documents, including text books, periodicals, lectures, patents and government reports, all widely circulated in the trade and available to the public. (Opinion, ante, p. 254).

7. The Answer also contained a counterclaim for unfair competition alleging that, although plaintiff had asserted its claim in two judicial forums, it nevertheless attempted to prevent defendants' entry into fair competition with plaintiff by widely circulating charges to the trade that defendants "fraudulently" and "maliciously" conspired" to appropriate plaintiff's trade secrets, by causing letters to be written to the Securities and Exchange Commission and to a Wall Street Brokerage House, in an attempt to prevent defendants from completing financing arrangements for the new competitive venture, and by widely circulating newspaper press releases prominently featuring plaintiff's unfounded claim of damages. The counterclaim was dismissed at the trial, upon application of the defendants pursuant to Rule 41(c), Federal Rules of Civil Procedure. (Opinion, ante, p. 255).

8. The following definitions, pertinent to the subject matter of the action were introduced in evidence by plaintiff, without objection: (Ex. 184, Tr. 1162).

*Semiconductor*

A material having an electrical conductivity intermediate between that of

---

tifiers of various types, including tubes, have been employed for this purpose since the early days of radio. A silicon

rectifier is a miniature rectifier, similar in construction to a transistor, utilizing the mineral silicon.

an insulator and a metal. The electrical characteristics of a semiconductor material are strongly dependent upon the presence of very small quantities of certain impurities. Semiconductors may be compounds or elements. Examples of the former are copper-oxide and indium-antimonide. Silicon and germanium are examples of elemental semiconductors.

*Rectifier*

A device which permits an electrical current to flow more readily in one direction than in the opposite direction.

*Peak Inverse Voltage*

The maximum voltage which may be applied to a silicon rectifier in the reverse direction.

*Transistor*

A semiconductor device used to amplify electrical signals.

*p-n Junction*

The boundary between two regions of a semiconductor, one region being p-type and the other n-type.

*Silicon Rectifier*

A rectifier consisting of a p-n junction in silicon together with its electrical connections and housing (if any).

*Silicon*

An element in the fourth group of the periodic table. The atomic weight of silicon is 28.06 and its atomic number is 14.

*Single Crystal*

A solid in which all the atoms are arrayed in order. For example, the atoms in single crystal silicon are arranged in a three-dimensional cubic array.

*Miller Indices*

A set of numbers used to define a particular set of atomic planes in a crystalline material. For example, the 1-1-1 planes in silicon pass through alternate corners of the unit cube.

*Slice (or Wafer)*

A portion of a silicon crystal cut at right angles to the axis of the crystal and having a large diameter to thickness ratio.

*Die (plural Dice)*

A small piece of silicon crystal usually prepared by cutting the wafer into bits.

*Etching*

A chemical process for the removal of undesired material.

*Alloy Junction*

A p-n junction formed by the alloying process. Sometimes called a fused junction.

*Alloying*

The process whereby a p-n junction is formed by dissolving a portion of a semiconductor crystal in a molten metal, allowing the dissolved material to regrow upon the original crystal and simultaneously adding the requisite impurity.

9. Tarzian, from about 1949 to date, was also engaged in the manufacture of rectifiers made of selenium, also a crystalline semiconductor material, used in radio and television applications. During that time, the individual defendants employed by him in this field were George Eannarino, previously engaged in the manufacture of selenium rectifiers for Federal Telephone Company, and Robert Parsons, Charles Smith, Clarence Chesnut, Ernest Fries and Frederick Schuller. (Opinion, ante, p. 266; Tr. 55–56).

10. Desirous of engaging in the manufacture of silicon rectifiers, in 1955, Tarzian purchased for $160,000 the plant of the Silicon Corporation of America and removed some of its personnel, its equipment and inventory to Bloomington, Indiana, where it established a silicon rectifier operation. The personnel included George B. Finn, Sarkes Tarzian's Chief Physicist, and Frank Oleksy, an individual defendant. (Opinion, ante, p. 266; Tr. 55–56).

11. The Silicon Corporation of America was not a financial or manufacturing success and the contract of purchase thereof contained no reference to trade secrets, confidential information or pro-

duction data, the only pertinent restriction being contained in an agreement that Silcoa would not compete with Tarzian for a limited period of one year, to January, 1957, eight months prior to the time the individual defendants were employed by Audio. (Exs. V to Z; Tr. 202–212; Opinion, ante, p. 266).

12. On the financial statement furnished by Tarzian to Dun and Bradstreet as of June 30, 1956, this "non-competitive agreement" is given a value of $5,000 which was depreciated to zero in a statement of June 30, 1957. Further, the acquisition of Silcoa did not cause any increase in the estimated value of Tarzian "patents and trade secrets" according to Tarzian's financial statements. For the three years to which the financial statements referred, the values of "patents and trade secrets" were given as follows: June 30, 1955, $681,756; June 30, 1956, $622,899; June 30, 1957, $565,-043. So that, by Tarzian's own accounting methods, there was no change in the value of "patents and trade secrets" through the accretion of any secret process of Silcoa's. (Opinion, ante, p. 269; Tr. 1961–1963); (Ex. GK).

13. Individual technical personnel employed at Silcoa and fully familiar with all of the processes which Tarzian claims to have purchased, did not have any agreement not to disclose any information they learned at Silcoa (with the exception of one employee whose restriction against disclosure of all of this information allegedly purchased by Tarzian was limited only to a period of two months following January, 1956). Further, several of the individuals employed by Silcoa and fully familiar with the Silcoa processes went with other companies and manufactured silicon rectifiers in accordance with those processes, and others supplied information for government publications which were distributed to the industry describing the essential details of what Tarzian claimed to be its exclusive process. (Tr. 1889–1908; 1930–1932; 1621–1625; 1655, 1656; 1533–1536; 1847–1862; Exs. HZ, IA, HX, ES, ES–1, DT, EQ–EW, DR, CM, BY, BZ).

14. In addition to the material purchased from Silcoa practical experience in the applications for selenium rectifiers contributed to production of a silicon rectifier at Tarzian. (Tr. 197–199).

15. The individual defendants were employed by Tarzian until the early part of August, 1957, at its plant in Bloomington, Indiana, and worked in various capacities related to the manufacture of selenium and silicon rectifiers. Such employment was of varying duration. At the time of termination, none of the individual defendants had an employment contract for any fixed term and they were employed in the following capacities: George J. Eannarino was Director and Manager; Robert C. Parsons was Research Engineer; Frank Oleksy was Production Supervisor; Hubert G. Dohmen was Technical Supervisor, Products Crystal Group; Charles C. L. Smith was Chief Quality Control Engineer; Clarence William Chesnut was Mechanical Technician; Frederick G. Schuller was Division Cost Accountant; Ernest C. Fries was Purchasing Agent. (Opinion, ante, p. 254).

16. Each of the individual defendants, except Frederick G. Schuller, signed an agreement that all trade, engineering, production, and technical data, information or know-how, including but not limited to customer lists, plans, specifications, drawings, sketches, layouts, and formulae, whether or not reduced to writing, used in the development and manufacture of Tarzian's products, or in research conducted by it, were its exclusive secret and confidential property. (Opinion, ante, p. 255).

17. Defendant George Eannarino, who was Director-Manager of the Tarzian Rectifier Division, at and prior to July 1957, complained to Tarzian that a provision in a written contract which he had with Tarzian which terminated in 1954, whereby he was to receive five percent (5%) of the profits of the Rectifier Division was never fulfilled. He was unhappy about the situation and sought

to interest others in the field, feeling there were no patents or trade secrets involved. (Opinion, ante, p. 267; Tr. 650–651; 621–622; 522–523; 310; 313).

18. The other individual defendants were dissatisfied with the conditions and terms of employment at Tarzian and in some cases had actively sought employment with other companies prior to their employment at Audio. (Tr. 1269, 1762–1763; 1513–1514, Ex. 81).

19. In the middle of July, 1957, the defendant Eannarino, at the suggestion of a third party, on his own initiative, approached Audio in an attempt to interest it in manufacturing silicon rectifiers at a plant to be located in California. (Ex. 80, Tr. 305–307; 376).

20. At two meetings with Eannarino on July 20, 1957 and August 6, 1957, Eannarino explained his dissatisfaction with his employment at Tarzian, the difficulties under which he and his associates were working, his intention and the intention of his fellow employees to terminate their association with Tarzian, regardless of whether Audio undertook to enter the silicon rectifier business or not; Audio stated that it would give no assurances of employment while any of the individuals were employed by another. (Exs. 80, 81, Tr. 299, 305–318, 324–329, 350, 466–468).

21. Eannarino advised Audio that he had tendered his resignation to Tarzian on July 30, 1957, and Audio then undertook consideration of entry into the business of manufacturing silicon rectifiers, and authorized the officers of the company to look into the matter on August 8, 1957. (Ex. 81, Tr. 538, 540).

22. On August 27, 1957 the Audio Board of Directors authorized the entry of that company into the rectifier business. (Tr. 538–540, Ex. 82).

23. After certain negotiations, the Audio company invested some $800,000 in new money which was secured through the sale of treasury stock in the purchase of a plant at Santa Ana, California, which they equipped with machinery, materials and stock in trade, for the production of silicon rectifiers. The evidence shows that some $200,000 in additional money has been invested and that as of early in December they were producing about 4,000 rectifiers a day. At or about the same time, these were offered to the trade at 83 cents. As of now, no profit has been realized by Audio. (Opinion, ante, p. 266; Tr. 637, 805, 811–2).

24. Each of the individual defendants tendered their resignations to Tarzian, journeyed to Santa Ana, California and entered the employ of Audio in the plant which it established for the manufacture of silicon rectifiers and at the same time expressly declared that they did not intend to carry to the new employers any trade secrets which Tarzian might have. (Opinion, ante, p. 269; Tr. 1763).

25. The compensation paid to the individual defendants by Audio was greater than had been paid to them by Tarzian but was consistent with the scale of wages already in effect for other employees at Audio. Eannarino had a right to leave at will and his arrangement with the other employees and with Audio did not amount to a conspiracy on their part or on the part of Audio. The pay increase is not out of line with the type of increases which skilled employees seek when they change employment and the fact that Eannarino was given an option to purchase a certain amount of Audio stock, 25,000 shares, at a fraction less than market, $7.76 per share, is easily and reasonably explained by Audio: They felt that as he was to be in charge of a unit of production, he had the type of responsibility which warranted encouraging him in acquiring stock in the corporation. Mr. William C. Speed thus described Eannarino's proposed work:

"The crystal rectifier company out here in Santa Ana, although a division of Audio Devices, is run on an almost autonomous basis. George

Eannarino is in charge of manufacturing, in charge of personnel, or at least he has people under him. In effect, he is—in effect and not in fact, he is the president of a small company out here in Santa Ana and then he has a plant manager of some kind under him and a production manager under him and I don't know what all." (Opinion, ante, p. 267; Tr. 1485, 1490–1492, 578–579).

26. The individual defendants were not indispensable employees of Tarzian and their employment by Audio was without intent to, and did not in fact, cause damage to Tarzian. (Tr. 791–792; Opinion, ante, p. 267).

27. Audio did not entice the individual defendants to leave the employment of Tarzian and enter the employment of Audio; the individual defendants left the employment of Tarzian for legitimate reasons and not as the result of any conspiracy between them, with or without Audio. (Opinion, ante, p. 268).

28. Audio has invested large sums of money in endeavoring to establish its new division and the facts do not establish that the situation is that of one who, without expenditure of money of his own, seeks a "free ride" through the unprivileged appropriation of value created by another. (Opinion, ante, p. 268).

29. One of the principal products of Tarzian's Rectifier Division is a silicon rectifier (known as the M–500) rated at 400 volts peak inverse voltage and 500 milliamperes and intended for use in radio and television sets to convert alternating current to direct current. (Tr. 71, 72, 104).

30. The Rectifier Division of Audio manufactures a silicon rectifier (known as the A–750), which is also rated at 400 volts peak inverse voltage and 500 milliamperes and is intended for use in radio and television sets. (Ex. 118, 119).

31. The rating of the rectifier is determined by the electrical requirements of standard makes of radio and television sets. (Tr. 2065).

32. There are a large number of manufacturers of silicon rectifiers, many of which manufacture rectifiers of 400 volt peak inverse voltage and 500 milliampere rating. Several of these manufacturers also manufacture for radio and television applications. (Exs. E, J, BW, AG, AI, AH, AE, AN; Tr. 2045–2046).

33. Audio has not attempted to simulate the Tarzian product or to hold the Audio rectifier out as the product of anyone but itself. While the device they manufacture, because of its nature, must be of a certain size, it does not look like the Tarzian device. And the only indicia it carries are those common to the trade showing the type of radio or television device it can replace. (Opinion, ante, p. 268; Exs. 35–38; A).

34. Audio's A–750 rectifier differs substantially in construction from the M–500 rectifier, at least in the following respects: (a) The A–750 has a tantalum counterelectrode and lead soldered to the rectifying junction, whereas the M–500 has a spring-pressed, aluminum contact plunger engaging the junction. (Ex. A; Tr. 2025, 2044, 2110). (b) The tantalum lead of the A–750 is staked to the other end terminal, whereas the M–500 uses its spring contact to engage the other end terminal. (Ex. A). (c) The A–750 has a welded, hermetically sealed metal casing, including a fused alumina seal, whereas the M–500 is encased in a threaded ceramic body. (Ex. A; Tr. 2110). (d) The casing of the M–500 is partly filled with silicone grease, whereas none is used in the A–750. (Ex.JN; Tr. 1140–1141).

35. The evidence is overwhelming that the machines and equipment for pulling crystals, slicing crystals, dicing crystals and performing all the other steps necessary to the production of this device are advertised in catalogues by nationally known firms who sell them either from stock or modify them to suit the particular need of a manufacturer. They were not a *secret source of supply*

open only to Tarzian which he could bind his employees not to disclose to others. There is no evidence that any of the employee-defendants took with them any blueprints, written data or invoices. (Opinion, ante, p. 268; Exs. BY, BZ, CI, CM, CQ, DD–DJ, DQ1–DR, DT, DV, DW, DY, EA–EL, EP, ES, EY, EZ, FI, HN, HZ, JM; Tr. 960–962, 1677–1681, 1731–1734, 1749–1756, 1514–1523).

36. The production know-how, information and data which plaintiff claimed to be restricted, confidential and secret in paragraph VIII of the complaint herein is set forth in detail in 43 steps and combinations thereof described in plaintiff's answers to interrogatories, filed herein July 11, 1957 and marked Exhibit JN in these proceedings. (Opinion, ante, p. 270).[2]

37. The trial of this case consumed 17 days. The transcript in the case covers over 2500 pages. Portions of depositions were introduced which were not transcribed into the record. The plaintiff introduced 214 exhibits, the defendants 274. Many of the exhibits consist of pamphlets and documents of many pages. All have been restudied since the trial in arriving at the conclusion that Tarzian had no trade secret. (Opinion, ante, pp. 269, 270).

38. Silicon diodes were developed prior to 1952, and they were an outgrowth of the work done by Dr. William Shockley of the Bell Telephone Laboratories who, on June 25, 1948, filed a patent application for what is commonly known as a transistor, a miniature device similar to a rectifier, utilizing semiconductive material such as silicon and germanium. In 1952, Bell Telephone Laboratories announced the development of a silicone p-n junction diode prepared by an alloying technique stating that the use of the device would fall under the general heading of rectifiers and other devices. (Opinion, ante, p. 270; Ex. Q. at pp. 1348 and 1351).

39. From that date to the present time, a tremendous expansion has taken place in the published art with respect to germanium, silicon and semiconductor devices such as transistors and rectifiers. (Tr. 1419–1420).

40. There is a known equivalency between germanium and silicon and between transistors and rectifiers made of such semiconductive materials and the fused junction rectifier is similar to the fused junction transistor in construction. (Tr. 1999, 2003, 2005–2010; Exs. IR, GV, GT–GZ).

41. Silicon rectifiers were, at the time of Audio's entry into the business, manufactured by a great variety of companies in the United States in a great variety of structures and characteristics for almost every known electric application and were by that time well-known devices in the art and the trade. (Exs. E, J. BW).

42. The testimony of the expert witnesses for both the plaintiff and the defendants established that in the manufacture of an alloyed junction silicon rectifier almost every manufacturer thereof must necessarily follow certain fundamental steps and, although plaintiff in its statement of its claimed process sets forth 43 separate items, together with combinations of such items, many of the items thereof were not in fact separate steps but integral parts of these well known fundamental steps. (Tr. 1191–1192, 2110–2111, 1912–1913; Opinion, ante, p. 271).

43. The published art also reflected that in the manufacture of an alloyed junction rectifier the following fundamental steps are employed: (a) the acquisition of single crystals of silicon by purchase from suppliers to the trade or the pulling or growing of a single crystal from polycrystal silicon, (b) the testing of the single crystal of silicon to determine its positive or negative characteristics (p or n) and to determine its

---

2. The Court has agreed to the understanding of counsel that the detailed outline of the 43 steps shall not be revealed.

resistivity characteristics, (c) the slicing and cutting of the crystal into particular dimensional units called dice for use in the rectifying device, (d) the treatment of the dice by etching with chemicals and/or other known means for reducing such dice to a pre-determined size and for the purpose of obtaining uniformity in size of such dice, (e) the selection and assembly of certain metals found in the periodic tables suitable for forming p-n ohmic junction in the alloying process by which such materials are fused with the silicon in appropriate furnace equipment, (f) the mounting of this fused junction on or to a suitable base or lead to provide for the connection of the rectifier to a terminal in an electrical circuit, (g) the treatment of the surface of the alloyed junction by the application of chemicals suitable for improving the definition of the junction to obtain a defined and regular path for the electrical current that is to be passed through the rectifier, (h) the encapsulation of a junction in a container suitable for installation in electric circuits. (Opinion, ante, p. 271; Exs. DT, HB, HC, ES, HZ, IA; Tr. 2015, 1912, 1191–1192).

44. These steps, materials and the equipment used, as well as alternative choices of material and equipment, were generally known to people in the trade and shown in the art late in 1957 and earlier in patents, technical publications, standard texts, published government reports and like material which taught not only the steps to be taken in the manufacture but the methods to be applied and the choice of materials to be used in effecting the etching, alloying, soldering and encapsulation of the device. (Exs. 130, 135, BY, BZ, CI, CM, CQ, CS, CT, DD–DZ, EA–EW, EZ, FA–FE, FH, FI, FL–FN, FT, GC, GD, GT–HC, HF–HJ, HL, HN–IB, IE–JN; Opinion, ante, p. 271; Tr. 2015–2099, 1887–1944, 1847–1886, 1533–1543, 2167–2187, 1620–1633).

45. The complete process is so shown in at least five publications readily available to the trade. (Exs. HB, HC, DT, HZ, IA, EZ, CI; Opinion, ante, p. 271; Tr. 2021–2107).

46. The expert witnesses for the plaintiff selected certain steps of the Tarzian process which they deemed to be of special significance relating to (1) the atmosphere used during the crystal pulling or growing step, (2) the rate of rotation and the pulling speed used during the crystal pulling or growing step, (3) the omission of a step in the treatment of the silicon wafers, (4) the lack of a certain orientation or alignment of the crystal in a particular atomic plane as defined in terms of the Miller Indices, (5) the use of particular metals in the alloying step, (6) the use of a specific type of alloying furnace, (7) the use of a specific chemical etch for treating the silicon, (8) the use of a transfer tray in the process, and (9) the combination of some of these steps. (Tr. 1174–1177, 1208–1210).

47. These selected steps were included in the plaintiff's statement of 43 items of secret and confidential matter and each of them were known to others in the trade and shown in publications readily available to the trade. (See Findings 44, 45 and 46).

48. Tarzian at the trial, in fact, disclaimed that it had a trade secret or any proprietary rights of any kind in the rectifier as a device, in the particular materials that are used to make a rectifier, the equipment or types of processes and the evidence further establishes that Tarzian did not use anything that was a secret in the art at the time the employee defendants left its employ. (Tr. 18; Opinion, ante, p. 270, note 66).

49. The testimony and exhibits establish a dissimilarity in the process claimed as secret by Tarzian and the process practiced by Audio. (Opinion, ante, p. 278).

50. Audio purchases its silicon primarily from Eagle Pitcher Co., whereas Tarzian's primary purchases were from duPont Company; Audio primarily purchases n-type silicon for production purposes, whereas Tarzian primarily pur-

chases p-type silicon; Audio purchases single pulled crystals from Knapic Electraphysics Co. whereas there is no evidence that such purchases were made by Tarzian at the time the individual defendants left Tarzian's employ. (Opinion, ante, p. 274; Exs. DK, FH; Tr. 1040–1041, 1657–1658, 1663).

51. Tarzian's production crystal pulling equipment was purchased from Precision Tool and Engineering Co. (which also sold similar equipment to other manufacturers), whereas Audio, although offered such equipment, did not purchase from such source of supply but obtained equipment that utilized a different rotation mechanism, a different seed holder arrangement, a different water cooling system, a different generator and a different drive. (Opinion, ante, p. 274; Exs. DE, DR, DV, DW, DY, EL, E, P; Tr. 1585, 1755–1756).

52. Tarzian utilized solar cell grade silicon and n-type silicon purchased from duPont for "doping" (adding concentrated impurities) its p-type production silicon, whereas Audio "blended" its silicon or purchased it "pre-doped". (Opinion, ante, p. 274; Tr. 1659, 1730, 1040–1041; Exs. JN, DK).

53. Audio utilizes a substantially different program of rotating and pulling single crystals, rotating at a schedule including 1 to 3–½ RPM, whereas Tarzian rotates at a constant rate of ¾ RPM, both rates being described in the art and in the specifications for standard crystal pulling equipment; Audio's pulling rate varies throughout the process but never exceeded 2.2″ or 3.5″ per hour, half of Tarzian's maximum of 6″ per hour. (Opinion, ante, p. 274, Exs. DU, DR, DY, DZ, DV, HS, DS, DN, DO, DP; Tr. 863, 864, 1744, 2058, 2055–2056, 2027).

54. Audio's method of cutting silicon and its orientation is substantially different than Tarzian's in that Audio cuts parallel to the longitudinal axis of the crystal to obtain an elongated slab, the dice obtained therefrom being oriented on the plane (1:1:1 Miller Indices) on which the crystal is pulled, whereas Tarzian cuts at right angles to the longitudinal axis of the crystal to obtain wafers (rather than slabs) which produce dice not oriented on the same plane as Audio's; epoxy resin being used by Tarzian in conjunction with the first and second cuts and such material not being so used by Audio; Audio removes all the wax used in conjunction with the cutting operation with hot sulphuric acid, followed by an acetone rinse, whereas Tarzian removes the wax with Fotocol or alcohol, followed by boiling sulphuric acid. (Opinion, ante, p. 274; Tr. 889, 1115–1116, 2110, 2058–2059, Exs. JN, CK, CL, GI).

55. A chemical etch consisting of hydrofluoric acid and nitric acid, materials almost uniformly suggested by the art for this step, is used by both Audio and Tarzian to reduce the dice to size, but Audio's proportions (3–8–0) are materially different than Tarzian's (1–5–0), the latter further being specifically suggested in a United States patent. (Opinion, ante, p. 274; Tr. 895, 1087–1088, 1117, 2071; Exs. ES, EZ, HS, HT, HU, HV, HW, HX).

56. Audio's dice thickness is controlled to 8/1000ths of an inch plus or minus 1/1000th. This is 11 per cent thinner than Tarzian's which is 9/1000ths plus or minus 1/1000th. Audio makes acceptable quality limits check: the dice found to be less than 7/1000ths are not used. (Opinion, ante, p. 274; Tr. 891, 1119–1120).

57. (a) Audio's alloying process is different. It uses a composition of one percent gallium, plus or minus ½ percent aluminum. Audio's volume of tin to Al–Ga is 4:1, Tarzian's 5:1. There is no conical recess at the bottom of Audio's jig holes. Tarzian has conical or "relieved" hole at bottom, which is tapered.

(b) *Temperature*—Audio's alloying temperature is 905°C., Tarzian's 960–970°C.

(c) *Vacuum*—Audio attains a vacuum down to or less than .001 micron, Tarzian .01 micron.

(d) *Equipment*—Audio uses a 6 inch bore on the diffusion pump. Tarzian a 4 inch. The larger bore aids "the pump down time considerably."

(e) *Oven Speed*—Audio's equals 0.46 inch per minute which equals 27 inches per hour, Tarzian's equals 36 to 38 inches per hour.

Further, the use of these materials, their general proportions and the alloying equipment, was known to and was practiced by others in the trade before Tarzian's use thereof and such uses were disclosed in publications, lectures and by physical examination of the devices by others in the trade. (Opinion ante, p. 274; Tr. 894–896, 924, 946–966, 1102, 1122–1127, 1535, 1552, 1557, 1622, 1626–1629, 1861, 1876–1882, 1888–1892, 1897, 1904–1908, 2027, 2032–2033, 2040, 2082–2089, 2179; Exs. Q, BY, BZ, EU, FD, HB, HC, HY, HZ, IA, ID, IE, IF, JN, 183).

58. In the soldering operation by which the alloyed units are soldered to terminal members or bases, the base parts are placed in jigs and flux is applied. It is deemed important, in the Tarzian process, that very little flux be applied, and this is done by spraying flux with an atomizer from a distance of three or four feet whereas Audio uses a much larger amount of flux, one full drop per unit, applying it individually with a hypodermic needle. (Opinion, ante, p. 274; Tr. 897–8, 980–1, 1129).

59. The soldering jigs used by Tarzian and Audio are entirely different, Audio using a two piece aluminum jig in which the units are assembled right side up and which is specially constructed, without contours for centering, to accommodate Audio's alloyed lead, the individual jigs being placed on a hot plate. Tarzian uses a one piece graphite jig contoured for centering in which the alloyed units are assembled upside down and the operation is carried out by conveying the jigs through an oven. (Opinion, ante, p. 274; Tr. 1128–29, 1131, 898, 953).

60. The etching procedures, by which undesirable impurities are removed from the junction and surface areas of the rectifier, of Tarzian and Audio are materially different. (Opinion, ante, p. 274).

61. An important feature of the Tarzian process is the use of a specially designed transfer tray between the soldering operation and the etching step by which all of the units are handled simultaneously. Audio does not use such a transfer tray but loads its etching trays by hand, the units being handled individually. (Opinion, ante, p. 274; Tr. 900, 987–992, 1128, 1146–7, Ex. GH).

62. Audio and Tarzian both use sodium hydroxide as an etching agent followed by a nitric acid cleansing bath, materials which the art shows to be widely used as etching and cleaning reagents in the manufacture of silicon and germanium semiconductor devices and to which one would, according to plaintiff's own expert, be led by the literature; (Ex. IX, IA, IV, IW, JA, JE, JJ, JC, JB, JD; Tr. 2095–2100, 2314); Audio's schedule of steps in the etching process however being different than Tarzian's in 6 of the 7 steps involved in the etching procedure. (Opinion, ante, p. 274; Tr. 1134–36; 901–903; 995).

63. In a following chemical etch or treatment Tarzian uses an alkaline sodium carbonate solution, the use of which material in connection with semiconductor manufacture being identified in publications and is not secret. (Opinion, ante, p. 274; Ex. EZ–p. 4, DI, FW). Further, Tarzian's specific solution is alkaline and has a pH of not less than 10 to 12 and is used in specific proportions, as identified in a patent application filed by Tarzian (Ex. FW; Opinion, ante, p. 274; Tr. 1956). Audio does not use an alkaline solution at this point but uses acidic sodium citrate having a pH of about 6.4. (Opinion, ante, p. 274; Tr. 1137, 1955–1956).

64. The use of silicone varnish for then sealing the etched and treated junction is a well known expedient employed by both Tarzian and Audio. Audio applies it in individual drops with a capillary device or hypodermic needle whereas

Tarzian dabs all of the units in a transfer tray simultaneously with a pad. (Opinion, ante, p. 274; Tr. 2044, 2051, 1000, 1139; Exs. DT, ES, HC, HS).

65. Audio's encapsulation involves welding a cap and end terminal to the base to form a seal and contact is made with the junction by "staking" the terminal onto a tantalum lead, a method entirely different than Tarzian's. Tarzian encases by screwing a ceramic body onto a base part and the other terminal and contact is made with the junction by an aluminum plunger which is pressed against the junction by a spring. No silicone grease is used by Audio during the encapsulation while Tarzian injects silicone grease into the interior to cover the junction before final encapsulation. (Opinion, ante, p. 274; Tr. 1139–41; 907–908, 2111; Exs. A, JN).

66. The total production time of the Tarzian process is approximately 20 hours while that of the Audio process is approximately 40 hours. (Opinion, ante, p. 274; Tr. 1004, 1146).

67. The testimony and exhibits establish that Audio's process is dissimilar to and differs materially from the Tarzian process and this conclusion is reinforced by an examination of the patents and publications in which the various steps claimed as secrets, and as set forth in plaintiff's statement, Exhibit JN, are taught. (Opinion, ante, p. 278).

68. Tarzian did not establish the amount of any damage it alleged to suffer as a result of the employment of the individual defendants by Audio, or as the result of the manufacture and sale of silicon rectifiers by Audio. (Opinion, ante, p. 274; Tr. 1438–1443).

69. Tarzian did not establish the value of a license which it offered the trade for use of its alleged secret process, the evidence establishing that the trade rejected such offers of a license because of the onerous conditions which Tarzian sought to impose on a licensee for what was not a secret process at all. (Opinion, ante, p. 269; Ex. GL–GS; Tr. 1964–1970).

## Conclusions of Law

I. This Court has jurisdiction of the parties and of the subject matter of this action.

II. The defendants, acting either alone or in combination, have committed no acts of unfair competition, breach of trust or agreement, or legal wrong against plaintiff in the termination of employment with plaintiff, in the employment of the individual defendants by the defendant Audio Devices, Inc., and/or in the manufacture and sale of silicon rectifiers.

III. The individual steps of plaintiff's process, or the process in toto, as described in plaintiff's statement filed herein July 15, 1958, are not trade secrets in law and in fact.

IV. The defendants' process for the manufacture of silicon rectifiers does not constitute an appropriation or use of any trade secret or other property of the plaintiff.

V. Plaintiff is not entitled to damages or injunctive relief and the complaint should be dismissed on the merits.

VI. The counterclaim of defendant Audio should be dismissed pursuant to Rule 41 of the Federal Rules of Civil Procedure.

VII. The defendants are entitled to costs to be taxed by the Clerk.

## Judgment

In accordance with the foregoing Findings of Fact and Conclusions of Law,

It Is Ordered, Adjudged and Decreed:

1. That the complaint herein be and the same hereby is dismissed.

2. That the counterclaim herein be and the same hereby is dismissed pursuant to Rule 41, Federal Rules of Civil Procedure.

3. That the defendants recover costs in the amount of $————.